JAMES A. SCRIVEN, Administrator of the Estate of ANTHONY GLENN SCRIVEN, Deceased v. SAMUEL McDONALD and PRISCILLA McDONALD.

(Filed 18 June, 1965.)

1. Death § 6—

    The statute creating the right of action for wrongful death provides for the recovery of compensation for the pecuniary injury resulting from the death, devoid of sentiment, and the rule applies when the deceased is an infant. G.S. 28-174.

2. Same—

    The burden is upon plaintiff in an action for wrongful death to prove pecuniary loss, and when plaintiff's evidence, together with defendant's

evidence not in conflict therewith, discloses that intestate was a mentally retarded boy, handicapped to the extent that he would continue to be a dependent person and could never earn a livelihood, nonsuit must be granted.

APPEAL by defendants from *Nimocks, E. J.,* September 1964 Session of ROBESON.

Plaintiff administrator instituted this action to recover damages for the alleged wrongful death of his intestate, Anthony Glenn Scriven, hereafter called Anthony.

Plaintiff alleged Anthony, an eleven-year-old boy, was walking north on the east side of RUPR 1710 about 11:45 a.m. on May 4, 1963, when a Ford car was being operated south on said rural unpaved road by defendant Priscilla McDonald; and that, on account of Priscilla's negligent operation thereof, the Ford struck, knocked down, ran over and fatally injured Anthony.

Answering, defendants denied all of plaintiff's essential allegations; and, as a further defense, alleged that the parents of Anthony, a mentally retarded child, were contributorily negligent in permitting him to walk, unattended, along a much-traveled roadway.

It was stipulated that defendant Samuel McDonald was the owner of the Ford and was liable, under the family purpose doctrine, for the actionable negligence, if any, of defendant Priscilla McDonald. It was stipulated further that Anthony was the illegitimate child of Mrs. Willie Mae (Glenn) Scriven; and that James A. Scriven, the administrator, was not the father of Anthony.

Evidence was offered by plaintiff and by defendants.

Issues as to the alleged negligence of defendants and as to the alleged contributory negligence of Anthony's mother and sole beneficiary were answered in favor of plaintiff. The jury awarded damages in the amount of $5,750.00. Judgment for plaintiff, in accordance with the verdict, was entered. Defendants excepted and appealed.

*Marion C. George, Jr., and Johnson, McIntyre, Hedgpeth, Biggs & Campbell for plaintiff appellee.*

*Henry & Henry for defendant appellants.*

BOBBITT, J. Defendants contend the action should have been nonsuited on the ground the evidence fails to show pecuniary loss on account of Anthony's death. The plaintiff's evidence pertinent to this contention, summarized except when quoted, is set forth below.

Anthony's mother and James Scriven, his step-father, were married the day after Anthony's first birthday. They had children. Anthony

took the name of "Scriven" and was reared as a member of this family until his death on May 4, 1963.

Anthony was born December 20, 1951. On the day of his death, his age was eleven years, four months and fourteen days. His height was four feet and ten inches.

Anthony had not been in any public school. When he was about eight, he was taken to Duke Hospital. Acting upon the recommendation of the doctors at Duke, Anthony was taken to O'Berry School at Goldsboro, N. C. He was in O'Berry School for about nine months. According to his mother, Anthony did not want to stay longer, "resented" the O'Berry School and she "couldn't bear to let him stay there."

The Scrivens' two older daughters, ages nine and seven, attended the public schools of Robeson County. These girls could dress themselves. Anthony "could not do as well as they." His mother testified: "(Anthony) could dress himself, but there were a few things he could not do, couldn't fasten buttons; could put on his shoes but couldn't tie them." James Scriven testified: "Anthony was the sort of child which you might group as a slow to learn, retarded; but he could do some things for himself." Again: "He was slower than other children. He wasn't able to apprehend *(sic)* and wasn't able to do things they could. The other children were nine, seven, six and five. Anthony could do about the same things as the five-year-old child could."

Anthony was "a very friendly child." He went to Sunday school and church with the family and got along well with all the children. His mother testified: "Anthony played around in the yard and with the rest of the kids." He had not done any work to make money. He did very well in responding to requests around the house. Members of the family had no difficulty "communicating with him."

Mrs. Williams, sister of Anthony's mother, testified: "(Anthony) was a slow learner, did learn but slower than the average child. He could sing almost any song he heard any choir singing. To pick up a book and read, he did not have this ability. . . . His ability and grasp of things improved as he grew older. His speech was better than it had been for two or three years and could walk better than he had for the past three years. He was able to communicate with us verbally. I was able to give him directions during his life. He carried out the instructions which I gave to him."

Mrs. Glenn, mother of Mrs. Scriven and of Mrs. Williams, testified she visited Anthony while he was at O'Berry School but "only saw him when attendants would bring him to us." On such a visit Anthony cried until he was told "we were going to take him home." Then he talked and laughed. His mother brought him home for the Thanksgiving holidays, 1961. He was never taken back. During the last year

of his life, at home, "his condition improved." She testified: "I am sure he couldn't come up to what we would call a normal child, but he could learn. His attitude and ability to learn was about eight, nine or ten. At the time of his death would be about on level of about age eight. I was able to talk with him and he with me. He was able to speak in complete sentences. . . . We had never tried to teach him letters much. He had begun to try to write his name. He had gotten 'A' and 'T' pretty good, but not all of them. He was toilet trained when he came from the school. He had receded a lot, but it didn't take but a little while to pick up when he found he was loved."

Defendant offered in evidence the deposition of Dr. Vernon P. Mangum, Superintendent of the O'Berry School, admittedly a medical expert, specializing in the field of pediatrics and psychiatry. He testified that Anthony had been admitted to "O'Berry Center" on January 24, 1961; that, although he "did the initial examination on him when he came in," he remembered the boy vaguely; and that his testimony was based largely on the medical record made by him and by other physicians at the O'Berry School. He testified, *inter alia,* as follows: "When he was admitted, he was observed to be a well-developed nine-year-old male with extreme infantile behavior." Again: "He was found to be in too low a level to be included in any training program other than the self-help program in the cottage that all children are involved." In a test conducted August 17, 1961, "he earned an I. Q. score of thirty, which would put him in a severely retarded range." The psychologist who gave the test noted a comment "that he thought the child was capable of functioning at a slightly higher level, but certainly not a level that could be included in an academic setting." Again: "A person with this I. Q. required total supervision all his life." Again: "We give total supervision to this group; we don't allow any of them to be out of sight of an attendant at any time, and the home situation actually needs the same. They are actually not responsible for their own safety. They can do simple tasks with a great deal of training. They would not be expected to be self-sufficient in a social sense or an economical sense. It is too nebulous to say directly what the lowest I. Q. rating a person could have and be expected to earn a living, but very few individuals below an I. Q. of fifty are able to make an independent adjustment in society, very few, and to my knowledge none functioning at an I. Q. of thirty and below are able to." Anthony "went home for Christmas (1961) vacation . . ." He was not returned to O'Berry School.

Under our statute conferring a right of action for wrongful death, G.S. 28-173, "(t)he plaintiff in such action may recover such damages as are a fair and just compensation for the *pecuniary* injury resulting

from such death." (Our italics.) G.S. 28-174. "It does not provide for the assessment of punitive damages, nor the allowance of nominal damages in the absence of *pecuniary* loss." (Our italics.) *Armentrout v. Hughes,* 247 N.C. 631, 101 S.E. 2d 793, 69 A.L.R. 2d 620; *Hines v. Frink,* 257 N.C. 723, 127 S.E. 2d 509.

In *Hines v. Frink, supra,* this Court affirmed a nonsuit of the counterclaim (cross action) of Frink, Administrator, for the alleged wrongful death of Gore, his intestate, on the ground he had failed to show any pecuniary loss resulting to the estate of Gore from Gore's death, the record being "devoid of any evidence as to the age, health, habits, or earning capacity of Gore."

The oft-stated rule for determining the basis and extent of the damages recoverable in a wrongful death action, namely, "the pecuniary injury resulting from such death," is well established. *Lamm v. Lorbacher,* 235 N.C. 728, 71 S.E. 2d 49, and cases cited. Moreover, notwithstanding greatly increased difficulty · in application, decisions of this Court hold the same rule applicable when the deceased is an infant. *Russell v. Steamboat Co.,* 126 N.C. 961, 36 S.E. 191; *Gurley v. Power Co.,* 172 N.C. 690, 90 S.E. 943, and cases cited: *Comer v. Winston-Salem,* 178 N.C. 383, 100 S.E. 619; *Bumgardner v. Allison,* 238 N.C. 621, 78 S.E. 2d 752.

The present action is distinguishable from the cases cited in that here plaintiff's evidence discloses affirmatively that Anthony was mentally retarded and thereby seriously handicapped. Moreover, plaintiff's evidence is that, after examining Anthony, the recommendation of the doctors at Duke was that he enter the O'Berry School, a mental institution under the North Carolina Hospital Board of Control; and that no material improvement resulted from his stay of nine or ten months in the O'Berry School.

The evidence, when considered in the light most favorable to plaintiff, discloses that Anthony was friendly, played with other children, was capable, subject to limitations, of dressing himself and was able to understand and carry out simple directions.

Mindful of the rule that defendant's evidence may be considered only "to the extent that it is not in conflict with plaintiff's evidence and tends to make clear or explain plaintiff's evidence," Strong, N. C. Index, Trial § 21, p. 316, we have refrained from setting forth portions of Dr. Mangum's testimony in conflict with the testimony of plaintiff's witnesses.

Plaintiff's evidence and portions of Dr. Mangum's testimony not in conflict therewith confront us with the fact that Anthony, from birth until death, was mentally retarded and thereby seriously handicapped. Absent substantial evidence, medical or otherwise, tending to show a

reasonable probability Anthony could or might overcome his handicap, the only reasonable conclusion to be drawn from the evidence is that he would continue to be a dependent person rather than a person capable of earning a livelihood. The burden of proof is upon plaintiff to show pecuniary loss to the estate on account of Anthony's death. In our view, plaintiff's evidence negatives rather than shows such pecuniary loss. Hence, the court erred in denying defendants' motion for judgment of involuntary nonsuit.

The statute, G.S. 28-174, leaves no room for sentiment. It confers a right to compensation only for pecuniary loss. Be that as it may, it seems appropriate to say that the mental picture gained from a reading of the record is one of tenderness and consideration for a beloved but seriously retarded and handicapped boy.

It is noted that the briefs do not cite decisions from other jurisdictions. In those considered in our research, none involves a factual situation sufficiently analogous to render the decision of persuasive significance.

In view of the ground of decision, it is unnecessary to discuss other questions raised by defendants' assignments of error.

Reversed.