HOWARD G. BOWEN, SR., ADMINISTRATOR OF ESTATE OF HOW-
ARD GIBSON BOWEN, JR., DECEASED v. CONSTRUCTORS
EQUIPMENT RENTAL COMPANY, a NORTH CAROLINA CORPORA-
TION, AND JAMES STEPHEN WILSON

No. 43

(Filed 1 June 1973)

1. **Electricity § 8; Negligence § 35; Rules of Civil Procedure § 26— crane
   cable striking power line — electrocution — contributory negligence**

   In an action to recover for the wrongful death of plaintiff's
   intestate who was electrocuted when the cable of a crane, which the
   intestate had the task of attaching to sections of concrete pipe,
   struck a power line, defendant's allegation that deceased was con-
   tributorily negligent in causing the cable to make contact with the
   power line was supported solely by the testimony of the defendant
   crane operator contained in the record of his adverse examination
   offered in evidence by plaintiff; however, plaintiff could impeach as
   well as contradict defendant's testimony, since, under G.S. 1A-1,
   Rule 26(e), the introduction in evidence by plaintiff of the adverse
   examination of defendant did not make defendant a witness for plain-
   tiff.

2. **Electricity § 8; Negligence § 35— crane cable striking power line —
   duty of deceased to exercise reasonable care for his own safety — con-
   tributory negligence**

   Evidence did not disclose that plaintiff's intestate who was elec-
   trocuted when a crane cable came in contact with a power line failed to
   exercise reasonable care for his own safety and was contributorily
   negligent as a matter of law where it tended to show that deceased
   had been given only general warnings of the danger of working in
   the vicinity of power lines, his place of duty at the time of the acci-
   dent was directly under the power lines, no request had been made
   that the power be cut off and twelve sections of pipe had already
   been removed from under the power lines with no incident suggestive
   of danger.

3. **Death § 7— wrongful death — instructions — life expectancy of re-
   cipients of damages**

   Trial court in a wrongful death action properly set aside that
   portion of the jury's verdict awarding plaintiff damages where the
   court failed to instruct the jury to take into consideration the life
   expectancy of the parents who were entitled to receive the damages
   recovered, rather than the life expectancy of deceased in determining
   the value of services, protection, care and assistance, society, com-
   panionship, comfort, guidance, and kindly offices and advice of de-
   ceased. G.S. 28-173; G.S. 28-174.

4. **Appeal and Error § 62— new trial on damages only — no abuse of
   discretion**

   The court will generally order a partial new trial in its discretion
   when the error or reason for the new trial is confined to one issue

which is entirely separable from the others and it is perfectly clear that there is no danger of complication; trial court in this wrongful death action properly granted new trial limited solely to the issue of damages.

ON defendants' appeal from, and on *certiorari* granted on plaintiff's petition to review, the decision of the Court of Appeals reported in 16 N.C. App. 70, 191 S.E. 2d 419, docketed and argued in this Court as No. 85 at Fall Term 1972.

Howard G. Bowen, Sr., as plaintiff-administrator, instituted this action against Constructors Equipment Rental Company (Rental Company) and James Stephen Wilson (Wilson) to recover damages on account of the alleged wrongful death of his intestate, Howard Gibson Bowen, Jr. (Howard).

Howard was killed instantly by electrocution on 26 June 1969 while working as an employee of Samet Construction Company (Construction Company). The fatal accident occurred when the cable of a crane owned by Rental Company and operated by Wilson came in contact with a high tension line. Howard was seventeen years old, had graduated from high school in June of 1969, and was temporarily employed as a laborer pending his admission to college in the fall of 1969.

Plaintiff alleged Howard's death was proximately caused by the negligence of Rental Company and Wilson and prayed that he recover $351,691.82 for damages sustained on account of Howard's wrongful death.

In a joint answer, Rental Company and Wilson denied actionable negligence on their part. As a further defense, they asserted that plaintiff's action was barred by Howard's contributory negligence. They also alleged that negligence on the part of Construction Company was a proximate cause of Howard's death and a bar to recovery to the extent of the payments made by Construction Company and its compensation carrier pursuant to the provisions of the Workmen's Compensation Act.

The only evidence was introduced by plaintiff. Summarized, except when quoted, it is set forth below.

Construction Company, as general contractor, was engaged in the construction of a building for Visual Presentations, Inc., on Kettering Road in High Point. Kettering Road ran generally east and west and had been paved, curbed and guttered. There was no sidewalk.

On 26 June 1969 the building was in "the finishing stages." The front was 50 feet south of the property line and approximately 60 feet back from the south curb of Kettering Road.

The natural flow of water was toward the north. Water had been caught in a manhole located thirty-six feet and four inches north of the newly constructed building and twenty-one feet and eight inches back from the south curb. From this manhole, the water flowed under Kettering Road into the city's storm sewer system. The interference with the natural flow caused by the project required that catch basins be constructed and that storm sewer lines be installed to carry the water from the catch basins to the manhole. A catch basin was located east of the building and southeast of the manhole.

Prior to 26 June 1969, a ditch, about one hundred feet long and "probably ten feet deep at its deepest point," had been dug by a backhoe. This ditch extended from the manhole diagonally across the front of the property to the catch basin to the east of the building. The storm sewer was to consist of reinforced concrete pipe.

It had been raining prior to the time the pipe was delivered. The delivery truck could not "get in there [next to the ditch] because it was so muddy. They put the pipe right down under the power lines." Except for two or three sections of forty-two inch pipe, each section was thirty inches in diameter, was three or four feet long, and "weighed 1400 or 1500 pounds."

In order to lay the pipe it was necessary to use a crane. Construction Company did not own a crane but arranged to rent one, along with an operator, from Rental Company.

"[A]bout two days prior" to the accident, Odell Couch, the job foreman, called Rental Company to make arrangements for renting a crane. Shortly thereafter, a Mr. Tucker of Rental Company visited the job site. Later Wilson (the crane operator) arrived with "a large stationary boom crane." Tucker and Wilson decided this crane was not suitable for the job and advised Couch that they would send out a smaller crane the next day.

Wilson testified: "[W]hen we had the other crane over there, Mr. Tucker mentioned that the reason we had to take the other one back was because this crane was too big to maneuver on the job, and that because of the wires we would need . . . a smaller crane. . . . The [larger] crane had a sixty-foot station-

ary boom, and the Groves TM 120 hydraulic crane had about a twenty-foot boom that could be extended sixty feet."

On the day of the accident the weather was good. Wilson arrived just before noon with the smaller hydraulic crane. Couch asked either Tucker or Wilson "if he would like us to move the pipe [out from under the power lines], and he said that he could do it from there." He initially positioned the crane "four or five feet [south] of the curb line of Kettering Road" on the west side of the manhole. Couch warned Wilson about the wires which were directly over the stack of pipe and also warned the employees of Construction Company to be careful around the power lines. He did not ask the power company to cut off the power while the crane was being operated.

In order to lift the pipe, a "finger or hairpin or hook" type of device furnished by Construction Company was attached to the crane cable. According to Norman Samet, president of Construction Company, this device weighed "a hundred pounds, or close to it." However, Wilson thought that the "approximate weight of the finger itself would probably be 20 pounds." Howard's job, at the time of the accident, was to insert the "hook" into the "female end of the pipe." As each section of pipe was removed from the stack and placed in the ditch other employees of Construction Company would join and interlock the pipe in tongue and groove fashion. Twelve sections had been so removed and located prior to the accident.

From the initial location Wilson moved about four or five sections of pipe. Describing how the crane moved these pipes, Couch testified that Wilson "extended the boom out and of course the cable will pick up real close to the boom, and it was out to an angle enough to get under the wires and not do nothing"; and that "[a]t no time in the operation of the crane and in the installation of this pipe when it was located on the west side of the ditch [it was on the east side when the accident occurred] did Mr. Wilson ever extend the boom up to the height of the wires."

After these four or five sections were placed in the ditch, Wilson moved the crane to a location east of the manhole. To do this "he had to fold the crane back in . . . the outlets and boom and all, and he went out into the street and came back in on the southeast side of the ditch" to a position about thirty feet from the curb of Kettering Road and aligned slightly to the

east of the northeast corner of the building. It was at this location when the accident occurred.

Couch testified that he had "stood out there for almost two hours or so watching the crane in operation." During this time from "three or four feet" was as close as the crane got to the power lines. He further testified: "As to whether at any time during the operation of the crane when I observed it at the second site at that time, did he ever extend the boom up to the height of the wires, not to my knowledge, not until I saw the accident. I didn't actually see the accident." Samet testified that the weight of the pipe "was very, very light compared to the capacity of the crane so that it would have the capacity to lift this small weight at a very low angle."

Just before the accident, Couch had to leave the construction site for about ten minutes. When he returned he went into the shack on the job site to make a telephone call. During Couch's absence Samet arrived on the premises.

When Samet arrived the crane was in operation at the location east of the manhole and in the process of laying a section of pipe in the ditch. As Samet was standing near the crane Wilson swung the crane back to get the next piece of pipe which was on the ground "right near the curb on Kettering Road." Samet testified: "I looked up and saw that the boom of the crane was up very high and . . . was moving very close to the power lines, and almost at the same instant as he was swinging around there seemed to be only a slight hesitation as it got very near the power line and then it moved closer to the power line, and the next thing I knew there was an electrical buzzing and arcing noise. . . . "

Samet further testified: "After I heard this electrical sound and at the time I looked at Howard . . . he was probably five feet south of the south curb line of Kettering Road. . . . The top of the boom was above the power lines. At that time, the cable was against the power lines" touching the line "only a few feet off of the pole. . . ." With reference to how high the boom extended above the wires at that time, Samet was of the opinion that there was "maybe 18 inches of the cable hanging down from the roller of the sheave" to the point of contact with the power line.

Samet further testified: "I looked up and saw the wire in contact with the cable from the crane, in contact with the elec-

trical wires—and I looked down and saw [Howard] . . . standing very close to this fork or finger that was hanging from the cable. At that time, I couldn't tell for sure if he was touching this piece of metal or not because of the angle and the distance. . . . I screamed his name, I believe, and ran around the crane, and he started moving away from this piece of metal, the fork, and appeared to be running from it."

Under cross-examination, Samet testified that he did not see Howard with his hand on the hook or see him pull the hook over under the power line in order to put it into the pipe; that although he had a clear vision, he was not looking at the "hook" at that time; and that he did not see Howard until after he saw the sparks and could not tell whether he had pulled the hook over toward the pipes. With reference to his previous testimony under oath that it appeared to him that Howard had his hand on the "hook," it did so appear to him but he could not be real sure; that Howard was erect, standing still, and appeared to have his hand on it, but he was not sure that Howard was touching it. At that time, Howard "was standing just about right under the wires, approximately." As far as Samet could tell, there was not anything that would have obstructed Howard's view of the crane and the wires. Too, he could have observed the sign [warning of danger in operating near power lines] on the side of the crane.

Meanwhile, Couch had completed his telephone call. Just as he walked out of the office he heard the "buzzing noise" and saw the boom which was "right straight up over the wire" moving back away from the wires. He was unable to see Howard at this time because a truck obstructed his view.

Couch further testified: "As to whether I had seen [Howard] holding onto this metal piece guiding it toward the pieces of pipe earlier, yes. As to whether he would hold onto this fork or hook and would guide it over to a piece of pipe, well, not necessarily. The crane would put the fork over there and he would push it inside. As to whether I just said that I had seen [Howard] with his hand on this fork or finger guiding it or moving it toward the pipe, placing it into the pipe, yes, sir. As to whether I saw him guiding or moving it toward the pipe on occasions, well, I really don't know whether he was moving it or whether the crane was. I couldn't say that, but he was guiding the fork. I saw him with his hand on it as it was moving. As to whether the cable which was attached to this hook was

such that the cable could swing from side to side, yes, sir, I assume it could swing from one way or the other. At the time of the accident, there was nothing in the area that would prevent [Howard] if he looked from seeing the crane, the cable and the wire. I had specifically warned him about the dangers of those wires."

On redirect examination, Couch emphasized that the closest he "saw it [the crane] get to the wire was actually about three or four feet" and that at no time did he "ever see the boom ever extend up to the height of these wires."

In his testimony in the adverse examination introduced by plaintiff, Wilson, the crane operator, described the accident as follows:

"After we had set the last piece of pipe, I was swinging around to where the other pipe was laying, and I had the hook about a foot or so off the ground, and [Howard] was steadying it, and just walking along beside it, more or less, and when I got close to the other pipe, he started to pull this finger thing toward a piece of pipe, and when I seen him doing this I stopped swinging, but it was too late. The cable was in the line, so I swung back the other way, and [Howard] started to run, and he ran about 6 foot and fell to the ground." [This conflicts with Samet's testimony that as the crane moved toward the wire there was a slight hesitation and then the boom moved *closer* to the wire.]

Wilson further testified: "As to what height I was booming at that time, the tip of the boom was approximately 40 feet from the ground. The tip of the boom then would be a distance of approximately 8 to 10 feet above those high-voltage wires. [Samet testified that the boom was about 18 inches above the wires.] . . . I had an unobstructed vision of the pipe and [Howard] and of the high-voltage wires, and I swung my boom within some 12 to 18 inches of those high-voltage wires and a distance of some 8 to 10 feet over and above the high-voltage wires."

Wilson further testified that it was necessary to boom at that height; that, when Couch said something to him about watching out for the wires, Howard and two or three others were standing behind Couch within hearing distance; and that he [Wilson] on several occasions had warned Howard "about being careful of the wires."

Wilson further testified: "Prior to the time that the accident occurred, [Howard] had not at any time pulled the finger over to any of the pipe. That was the first time he had done that. When he pulled the finger toward the pipe on the occasion when the accident occurred, it pulled the cable to an angle out from under the boom and into the wires. When I first started to pull the finger, the crane was moving, but as he started pulling, I stopped. When I stopped, I was about 12 to 18 inches away from the wire. There was no way to get that pipe out from under the wires where it was located without moving the crane over fairly close to the wires. When I warned [Howard] about the wires, he acknowledged what I told him. He would say 'Okay.' On another occasion, he looked toward the wires, or just nodded his head. The reason I warned him more than once was that I just wanted to keep reminding him that the wires were up there."

Leslie Preston, a district engineer with Duke Power Company, visited the job site the day after the accident and made certain measurements with regard to the power lines. He testified that the utility pole was about 18 inches from the curb of Kettering Road; that the height of the wire at the point of contact was 32 feet 8 inches; and that the point on the ground directly under the point of contact was "about 5½ feet" from the curb of Kettering Road.

Howard G. Bowen, Sr., who is vice president and general superintendent of Construction Company, testified that, although he was not present when the crane was being operated, he had warned his son of the general dangers of construction and mentioned the wires to him but had not requested that the power be cut off.

Testimony relating to the issue of damages will be set forth in the opinion.

Rental Company and Wilson, the original defendants, brought Construction Company into this action as a third-party defendant for indemnification based on an agreement in the rental contract between Construction Company and Rental Company. However, the trial court ordered severance and separate trials of the issues between plaintiff and defendants Rental Company and Wilson, and the issue of indemnification between defendants Rental Company and Wilson, as third-party plaintiffs, and Construction Company, as third-party defendant.

The separate trial of the issues between plaintiff and defendants Rental Company and Wilson was before Judge Exum and a jury at 3 January 1972, Two-Week Regular Civil Session, of Guilford Superior Court (High Point). It was stipulated that at the time of the accident defendant Wilson was acting as agent of defendant Rental Company.

The issues submitted, and the jury's answers, are as follows:

"1. Was the death of plaintiff's intestate, Howard Gibson Bowen, Jr., proximately caused by the negligence of the defendants, James Stephen Wilson and Constructors Equipment Rental Company?

"ANSWER: YES.

"2. If so, did the negligence of plaintiff's intestate, Howard Gibson Bowen, Jr., contribute to his death?

"ANSWER: No.

"3. What amount, if any, is the plaintiff entitled to recover?

"ANSWER: $115,000.00.

"4. Was Samet Construction Company negligent on the occasion in question, and if so was such negligence a proximate cause of the death of plaintiff's intestate?

"ANSWER: YES."

After the verdict, Rental Company and Wilson, pursuant to Rule 50 (b) (1) of the Rules of Civil Procedure, G.S. 1A-1, moved for judgment notwithstanding the verdict on the first, second and third issues, and in the alternative for a new trial for various "errors which may have arisen." Their motions were denied and they excepted. The court also denied their alternative motion for a new trial on the first and second issues. However, the court allowed their motion to set aside the verdict on the third issue but solely on the ground that the court had committed error in its instructions to the jury in the specific respect discussed in the opinion.

Construction Company, and its compensation carrier, moved that the court set aside the jury's answer to the fourth issue on the grounds that (1) there was no evidence to support the an-

swer; and (2) there was "probably some error in the Charge with respect to that Issue." This motion was denied and Construction Company and its compensation carrier excepted.

Plaintiff excepted to the ruling of the court which set aside the jury's answer to the third issue and granted a new trial with reference thereto and appealed to the Court of Appeals.

Defendants Rental Company and Wilson excepted to the ruling of the court which denied their motion for judgment notwithstanding the verdict on issues one and two and appealed to the Court of Appeals.

On defendants' appeal the Court of Appeals affirmed the ruling which denied their motion for judgment notwithstanding the verdict as to the first and second issues. One member of the hearing panel having dissented, they appealed this decision to the Supreme Court.

On plaintiff's appeal, the Court of Appeals (without dissent) affirmed the ruling of the court which set aside the answer to the third issue and awarded a new trial with reference thereto on account of error in the charge. Plaintiff's petition for *certiorari* to review this portion of the decision was allowed by this Court.

This appeal does not involve any of the issues in the conditional cross-action by defendants Rental Company and Wilson against Construction Company for indemnification. Too, Construction Company and its compensation carrier have not brought forward their exception to the court's denial of their motion to set aside the jury's answer to the fourth issue.

*Morgan, Byerly, Post & Herring by W. B. Byerly, Jr., for plaintiff.*

*Smith, Moore, Smith, Schell & Hunter by Bynum M. Hunter and David M. Moore II for defendants.*

BOBBITT, Chief Justice.

*Defendants' Appeal—Part I*

Defendants' Assignment of Error No. 1 is based on exceptions to the denial of their motions for a directed verdict and for judgment notwithstanding the verdict. It presents a question

of law, namely, whether the evidence was sufficient to require submission to the jury. *Kelly v. Harvester Co.*, 278 N.C. 153, 157, 179 S.E. 2d 396, 397 (1971). In the consideration thereof the evidence is to be taken in the light most favorable to the plaintiff. *Cutts v. Casey*, 278 N.C. 390, 411, 180 S.E. 2d 297, 307 (1971).

There was ample evidence to require submission of the first (negligence) issue and to support the jury's affirmative answer. Defendants do not contend otherwise. They base this assignment solely on their contention that *plaintiff's evidence* establishes the contributory negligence of his intestate *as a matter of law*.

We note that "[a] party asserting the defense of contributory negligence has the burden of proof of such defense." G.S. 1-139.

In an action for wrongful death, a directed verdict for the defendant(s) on the ground of contributory negligence should be granted when, and only when, the evidence, taken in the light most favorable to plaintiff, establishes the contributory negligence of plaintiff's intestate so clearly that no other reasonable inference or conclusion may be drawn therefrom. Discrepancies and contradictions in the evidence, even though such occur in the evidence offered on behalf of plaintiff, are to be resolved by the jury, not by the court. *Stathopoulos v. Shook*, 251 N.C. 33, 36, 110 S.E. 2d 452, 455 (1959), and cases cited.

Defendants base their contention that Howard was contributorily negligent *as a matter of law* on two propositions: (1) That Howard, by pulling the "finger" or "hook" toward another section of pipe, *caused* the *cable* to make contact with the power line; and (2) that, notwithstanding he had been fully warned of the danger, Howard took hold of the "finger" or "hook" without exercising due care to ascertain that he could do so with safety.

[1] Defendants' allegation that Howard *caused* the *cable* to make contact with the power line is supported solely by the testimony of Wilson contained in the record of his adverse examination offered in evidence by plaintiff.

Prior to the adoption of the Rules of Civil Procedure, G.S. 1A-1, decisions of this Court had held that a plaintiff, by offering the adverse examination of a defendant, made the deponent

his (plaintiff's) witness and thereby represented that he was worthy of belief. *Cline v. Atwood,* 267 N.C. 182, 186, 147 S.E. 2d 885, 888 (1966), and cases cited. Under these decisions, the plaintiff was not allowed to impeach defendant by attacking his credibility but was permitted to offer contradictory testimony of other witnesses.

Rule 26(e), which supersedes prior rules in respect of the introduction by a party of the deposition (adverse examination) of *an adverse party,* provides:

"(e) *Effect of taking or using depositions.*—A party shall not be deemed to make a person his own witness for any purpose by taking his deposition. The introduction in evidence of the deposition or any part thereof for any purpose other than that of contradicting or impeaching the deponent makes the deponent the witness of the party introducing the deposition, *but this shall not apply to the use by an adverse party of a deposition as described in section (d)(1).* At the trial or hearing any party may rebut any relevant evidence contained in a deposition whether introduced by him or by any other party." (Our italics.)

Under Rule 26(e) the introduction in evidence by a plaintiff of the adverse examination of the defendant no longer makes the defendant a witness for the plaintiff. Plaintiff does not thereby represent the defendant as being worthy of belief as to each and every aspect of his testimony. He may *impeach* him as well as *contradict* him.

Rule 43(b), the counterpart of Rule 26(e), applies when a plaintiff, instead of introducing the adverse examination of the defendant, calls the defendant as an adverse witness to testify at trial. In such case, Rule 43(b) permits the plaintiff to "interrogate him by leading questions and contradict and impeach him in all respects as if he had been called by the adverse party." In marking the distinction between the introduction and use of the testimony of *an adverse party,* whether obtained by adverse examination prior to trial or at trial, and the introduction and use of the testimony of *a witness other than a party,* whether obtained by deposition or at trial, both Rule 26(e) and Rule 43(b) recognize that the self-interest of the adverse party bears upon the credibility of that portion of his testimony which tends to exculpate him and to place blame upon another.

Both Rule 26(e) and Rule 43(b) are in accord with this forceful statement by Dean Wigmore: "If there is any situation in which any semblance of reason disappears for the application of the rule against impeaching one's own witness, it is when the *opposing party is himself called by the first party,* and is sought to be compelled to disclose under oath that truth which he knows but is naturally unwilling to make known. To say that the first party guarantees the opponent's credibility is to mock him with a false formula; he *hopes* that the opponent will speak truly, but he equally perceives the possibilities of the contrary, and he no more guarantees the other's credibility than he guarantees the truth of the other's case and the falsity of his own." IIIA Wigmore on Evidence, § 916, Chadburn Revision (1970).

Under Rule 26(e) and also by reason of the contradictory evidence of other witnesses, we hold that the credibility and weight of Wilson's testimony were matters for jury determination.

In 32A C.J.S., Evidence, § 1040(2), pp. 774-75, this statement appears: "In recent years statutes and rules of procedure have been enacted in many jurisdictions permitting a party to call his adversary or the latter's employee as a witness without vouching for the credibility of the witness or loss of the right of impeachment. Under such statutes and rules, it has been held that a party calling his adversary as a witness *is not concluded by his uncontradicted testimony,* and that the party so eliciting evidence of the adverse party may rely on such portion of his testimony as is favorable to him, and *is not bound by adverse testimony.*" (Our italics.)

The italicized portions of the quoted statement are directly supported in respect of Rule 43(b), Federal Rules of Civil Procedure, which is substantially the same as our Rule 43(b) in respect of the matter now under consideration, in the following cases: *Moran v. Pittsburgh-Des Moines Steel Company,* 183 F. 2d 467 (3rd Cir. 1950); *Nuelsen v. Sorensen,* 293 F. 2d 454 (9th Cir. 1961); *Feller v. McGrath,* 106 F. Supp. 147, 150 n. 4 (W.D. Pa. 1952). The opinion in *Moran* contains this statement: "Rule 43(b), we think, is utterly inconsistent with any notion about being bound by his testimony. It seems to us that any statement to the effect that a party is bound by the testimony of a witness whom he is free to contradict and impeach is inherently anomalous." State decisions in accord

include the following: *Phillips v. Phillips,* 29 Mich. App. 127, 185 N.W. 2d 168 (1970); *Best v. Huber,* 3 Utah 2d 177, 281 P. 2d 208 (1955); *Miller v. Dussault,* 26 Cal. App. 3d 311, 103 Cal. Rptr. 147 (1972); *Isaacs v. National Bank of Commerce of Seattle,* 50 Wash. 2d 548, 313 P. 2d 684 (1957). *Cf. P. & N. Investment Corporation v. Rea,* 153 So. 2d 865 (Fla. App. 1963); *Bogle v. Conway,* 198 Kan. 166, 422 P. 2d 971 (1967); *Herbert v. Sandia Savings & Loan Association,* 82 N.M. 656, 486 P. 2d 65 (1971). *See also Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W. 2d 632 (Iowa 1969), where *Moran* was cited to support the same holding under an Iowa rule substantially in accord with our Rule 26(e) and relating specifically to the introduction of the adverse examination of the testimony of an adversary taken before trial. In accord with *Schmitt,* we hold that the rule applicable to the testimony at trial of an adverse party under Rule 43(b) is equally applicable to the adverse party's testimony under adverse examination under Rule 26(e).

State decisions which hold, subject to certain exceptions, that a party offering the testimony of an adverse party, whether in the form of an adverse examination prior to trial or as a witness at trial, is bound by his adversary's testimony except to the extent it is contradicted or impeached, include the following: *Dominick v. Behrends,* 130 Ill. App. 2d 726, 264 N.E. 2d 297 (1970); *Williams v. Wheeler,* 252 Md. 75, 249 A. 2d 104 (1969); *Vokroy v. Johnson,* 233 Md. 269, 196 A. 2d 451 (1964). [*But see P. Flanigan & Sons v. Childs,* 251 Md. 646, 248 A. 2d 473 (1968), and *Proctor Electric Co. v. Zink,* 217 Md. 22, 141 A. 2d 721 (1958).] *Readshaw v. Montgomery,* 313 Pa. 206, 169 A. 135 (1933). [*But see Argo v. Goodstein,* 438 Pa. 468, 265 A. 2d 783 (1970), and *Duffy v. National Janitorial Services, Inc.,* 429 Pa. 334, 240 A. 2d 527 (1968).]

There being independent evidence of the negligence of defendants, we hold that plaintiff is not bound by the testimony of Wilson on adverse examination which relates directly to the issue of contributory negligence, an issue on which defendants have the burden of proof. With reference thereto, we hold that the credibility and weight of Wilson's testimony were for determination by the jury. Even so, in the present case, Wilson's testimony on adverse examination was substantially contradicted and impeached by other evidence offered by plaintiff. The conflicts include those narrated below.

Wilson testified that, when swinging the boom, he *stopped* when he was about 12 to 18 inches from the wires; that Howard pulled the cable into the power line; and that, after he had stopped, the cable "was in the line, so [he] swung back the other way." On the other hand, Samet testified that, as he was watching the movement of the boom, "there seemed to be only a slight hesitation as it got very near the power line and then it moved closer to the power line and the next thing [he] knew there was an electrical buzzing and arcing noise. . . . " Too, Couch testified that when he came out of the shack he heard the "buzzing noise" and saw the boom "right straight up over the wire."

Wilson testified that he "considered it necessary to boom at a distance of approximately 40 feet above the ground level"; that he was booming at that height when the accident occurred; and that the tip of the boom was then "approximately 8 to 10 feet above those high-voltage wires." On the other hand, Samet testified that the boom was then about 18 inches above the point of contact with the power line. And Couch, who, except for a brief interval, had witnessed the manner in which the sections of pipe were being removed, testified that until after the accident he had never seen the boom higher than the power line.

If the tip of the boom were 8 or 10 feet higher than the power line, unless it were directly above the power line, it may be inferred that this would require that the "fork" at the end of the cable be drawn under the power line in order to reach another section of pipe. Nothing in the evidence indicates that the section of pipe which was to be removed was in a more hazardous location than any of the sections which had been previously removed. The fact that twelve sections of pipe had been removed without incident permits the inference that the tip of the boom had not been higher than the power lines.

The evidence is unclear as to when Howard made contact with some electrified portion of the cable or finger. Evidence tending to show that the crane and cable swung toward the power line and then swung away and that Howard ran a short distance before collapsing leaves open for speculation whether contact was made when the boom and cable were swinging toward the power line or when they were swinging from the power line.

Samet testified that the capacity of this crane was such that these pipes could have been removed when the tip of the boom was below the power line. The Groves hydraulic crane was used because of its maneuverability. Its boom could be extended to sixty feet or retracted to twenty feet. It could be adjusted so that the boom would be at a very low angle. In moving to its first location, the crane had to pass under the power line; and, in moving from this location on the west side of the ditch to its second location on the east side of the ditch, the crane had to pass under the power lines twice, first when it went out into the street and again when it came back onto the job site.

The jurors were instructed to answer the second (contributory negligence) issue "Yes" if the defendants had satisfied them from the evidence and by its greater weight that Howard "knew or should have known of the location of the energized electrical transmission wires on the occasion in question and the boom and the cable on the crane, and that he pulled on the finger or fork at the end of the cable so as to cause the cable to come into contact with the transmission wires when, in the exercise of reasonable care commensurate with the circumstances, he could and should have avoided pulling on the cable when he knew or should have known that such a pull would likely result in his injury or death . . . and that such action on his part was a proximate cause of his death."

[2] Without reference to whether Howard caused the fatal accident in the manner indicated by Wilson's testimony, defendants contend the evidence discloses that Howard failed to exercise reasonable care for his own safety and was contributorily negligent as a matter of law. In support of this contention, defendants stress evidence that Howard had been warned of the danger of working in the vicinity of the power lines. However, the warnings were general in nature. His place of duty was directly under the power lines. No request had been made that the power be cut off. Couch had been advised that the pipe could be moved from under the power lines by means of the crane. No incident suggestive of danger had occurred during the removal of twelve sections of pipe. Absent notice to the contrary, whether the assumption by Howard that Wilson would continue to operate the crane in the same manner was consistent with the exercise of reasonable care, was for determination by the jury. *Weavil v. Myers*, 243 N.C. 386, 391, 90 S.E. 2d 733,

737-38 (1956); *Lewis v. Barnhill,* 267 N.C. 457, 464, 148 S.E. 2d 536, 542 (1966). Each of the cases cited by defendants has received careful consideration. In our view, the factual situation in each is distinguishable from that presently under consideration.

The jurors were instructed to answer the second (contributory negligence) issue "Yes" if the defendants had satisfied them from the evidence and by its greater weight that Howard, "on the occasion in question failed to observe the location of the boom and cable on the crane with reference to their proximity to the electrical transmission wires when, in the exercise of reasonable care commensurate with the circumstances then existing, he could and should have made such an observation . . . and that such action on his part was a proximate cause of his death."

The jury, having failed to find that Howard was contributorily negligent in either of the respects alleged, answered the second issue "No."

For the reasons stated above, the court properly denied defendants' motions for a directed verdict and for judgment notwithstanding the verdict. Defendants' Assignment of Error No. 1 is overruled. Discussion of their remaining assignments of error is deferred pending consideration of questions presented by plaintiff's appeal.

### Plaintiff's Appeal

Plaintiff assigns as error the action of the trial judge in setting aside the verdict and in ordering a new trial as to the (third) issue of damages on the ground that he had erroneously instructed the jury with reference thereto. The record contains no formal order as to the ground on which the ruling now challenged by plaintiff was based. However, in explanation of his ruling, the trial judge made the following statement:

"I am going to ALLOW your motion to set aside the verdict on the Third Issue, on the grounds that the Court feels it committed error in its instructions to the Jury, inasmuch as the Court should have instructed the Jury that on the value, the monetary value of the services, protection, care and assistance, society, companionship, comfort, guidance, and kindly offices and advice, the Jury should have taken into account the life expectancy of the parents of the decedent, they being those

persons who are entitled to these things under the evidence, the Court being of the opinion that the age of the parents having been offered and the Court should have instructed the Jury on what the Mortuary Tables showed as to their life expectancy so as to give the Jury the opportunity to consider the fact that their life expectancy may have been shorter than the life expectancy of the deceased, and on that ground and on that ground only the Court is going to allow the defendants' motion to set aside the verdict on the Third Issue only."

To answer the specific question presented by plaintiff's appeal requires consideration of Chapter 215, Session Laws of 1969 (1969 Act), entitled "An Act to Rewrite G.S. 28-174, Relating to Damages Recoverable for Death by Wrongful Act," which became effective upon its ratification on 14 April 1969.

Prior to the effective date of the 1969 Act, when a person was injured and later died as a result of the negligence of another, his personal representative had two causes of action, namely, (1) a cause of action to recover, *as general assets of the estate,* damages on account of the decedent's pain and suffering and on account of his hospital and medical expenses, and (2) a cause of action to recover, for the benefit of his next of kin, damages on account of the *pecuniary loss* resulting from his death. *Stetson v. Easterling,* 274 N.C. 152, 156, 161 S.E. 2d 531, 534 (1968), and cases cited.

In *Hoke v. Greyhound Corp.,* 226 N.C. 332, 38 S.E. 2d 105 (1946), it was held that, under the statutes now codified as G.S. 28-172 and G.S. 28-175, an injured person's common law right of action to recover damages for hospital and medical expenses and for pain and suffering caused by the negligence of another survived to the injured party's personal representative. *Accord: Hinson v. Dawson,* 241 N.C. 714, 718, 86 S.E. 2d 585, 588, 50 A.L.R. 2d 333, 338 (1955); *Sharpe v. Pugh,* 270 N.C. 598, 601, 155 S.E. 2d 108, 111 (1967). In such action, as held in *Hinson v. Dawson* (second appeal), 244 N.C. 23, 92 S.E. 2d 393 (1956), this Court recognized that, upon sufficient allegations and evidence that the injury was inflicted by the wilful or wanton conduct of the defendant, the plaintiff was entitled to have submitted an issue as to punitive damages. We note that G.S. 44-49 creates a lien on the recovery *in such personal injury action* in favor of those who render hospital, medical, nursing, and other specified services, in connection with the injuries on which the action is based. *In re Peacock,* 261

---

**Bowen v. Rental Co.**

---

N.C. 749, 136 S.E. 2d 91 (1964). Apart from this statutory lien, the recovery is subject to the debts of the decedent and to any disposition within the terms of the decedent's will. Unless modified *by implication* by some provision of the 1969 Act, an injured person's common law right of action in respect of damages he sustained during the interval between injury and death now survives to his personal representative.

The right of action to recover damages for wrongful death was created by and is based on the statute codified as G.S. 28-173. The 1969 Act, which rewrote G.S. 28-174, relates solely to the elements of damages recoverable in a wrongful death action. It does not refer to or purport to modify G.S. 28-173.

G.S. 28-173 provides:

"§ 28-173. *Death by wrongful act; recovery not assets; dying declarations.*—When the death of a person is caused by a wrongful act, neglect or default of another, such as would, if the injured party had lived, have entitled him to an action for damages therefor, the person or corporation that would have been so liable, and his or their executors, administrators, collectors or successors shall be liable to an action for damages, to be brought by the executor, administrator or collector of the decedent; and this notwithstanding the death, and although the wrongful act, neglect or default, causing the death, amounts in law to a felony. The amount recovered in such action is not liable to be applied as assets, in the payment of debts or legacies, except as to burial expenses of the deceased, and reasonable hospital and medical expenses not exceeding five hundred dollars ($500.00) incident to the injury resulting in death; provided that all claims filed for such services shall be approved by the clerk of the superior court and any party adversely affected by any decision of said clerk as to said claim may appeal to the superior court in term time, but shall be disposed of as provided in the Intestate Succession Act.

"In all actions brought under this section the dying declarations of the deceased as to the cause of his death shall be admissible in evidence in like manner and under the same rules as dying declarations of the deceased in criminal actions for homicide are now received in evidence."

G.S. 28-173 brings forward through successive codifications the basic provisions of Section 70, Chapter 113, Public Laws of

1868-'69. The 1868-'69 Act has been amended as follows: (1) Chapter 29, Public Laws of 1919, inserted the provision relating to the competency of dying declarations; (2) Chapter 113, Public Laws of 1933, inserted the words, "except as to burial expenses of the deceased"; (3) Chapter 246, Session Laws of 1951, deleted the provision requiring that the action be commenced "within one year after such death"; (4) Chapter 879, Session Laws of 1959, substituted the words "the Intestate Succession Act" for the words "this chapter for the distribution of personal property in case of intestacy"; and (5) Chapter 1136, Session Laws of 1959, inserted the present provisions relating to hospital and medical expenses.

Prior to the effective date of the 1969 Act, G.S. 28-174, which brought forward through successive codifications *without amendment* the provisions of Section 71, Chapter 113, Public Laws of 1868-'69, provided:

"§ 28-174. *Damages recoverable for death by wrongful act.* —The plaintiff in such action may recover such damages as are a fair and just compensation for the pecuniary injury resulting from such death."

With reference to the origin and import of the statutes quoted above, see *Lamm v. Lorbacher,* 235 N.C. 728, 71 S.E. 2d 49' (1952); *Armentrout v. Hughes,* 247 N.C. 631, 101 S.E. 2d 793 (1958); *Bryant v. Woodlief,* 252 N.C. 488, 114 S.E. 2d 241, 81 A.L.R. 2d 939 (1960).

Except as to burial expenses of the deceased, and reasonable hospital and medical expenses not exceeding $500.00, G.S. 28-173 provides that the only persons entitled to receive the damages recovered in a wrongful death action are those entitled to the decedent's personal estate under the Intestate Succession Act. The persons so entitled are to be determined as of the date of the decedent's death. *Bank v. Hackney,* 266 N.C. 17, 20, 145 S.E. 2d 352, 355 (1965); *Cox v. Shaw,* 263 N.C. 361, 368, 139 S.E. 2d 676, 681 (1965); *Davenport v. Patrick,* 227 N.C. 686, 689, 44 S.E. 2d 203, 205 (1947); *Neill v. Wilson,* 146 N.C. 242, 245, 59 S.E. 674, 675 (1907).

We note that the recovery in an action for wrongful death created by and based on G.S. 28-173 is not a general asset of the decedent's estate. It is not subject to the payment of his debts. Nor could the decedent by will or otherwise have diverted

any portion of such recovery from the persons who would be entitled thereto under the Intestate Succession Act.

We note further that neither burial expenses nor hospital and medical expenses up to a maximum of $500.00 *were* recoverable as elements of damage within the purview of G.S. 28-174 but were payable out of "[t]he amount recovered in such action. . . . " *Davenport v. Patrick, supra,* at 691, 44 S.E. 2d at 206-07.

Prior to the 1969 Act, this Court, in numerous decisions, held that the measure of damages recoverable under G.S. 28-174 for the loss of a human life was the *present value* of the *net pecuniary worth* of the deceased based on his life expectancy. *Bryant v. Woodlief, supra,* and cases cited. The successive steps by which the jury was to arrive at the amount of its award are set forth in *Caudle v. Railroad,* 242 N.C. 466, 469, 88 S.E. 2d 138, 140 (1955). G.S. 28-174 "[did] not provide for the assessment of punitive damages, nor the allowance of nominal damages in the absence of pecuniary loss." *Armentrout v. Hughes, supra,* at 632, 101 S.E. 2d at 794. G.S. 28-174 left no room for sentiment. It conferred a right to compensation only for pecuniary loss. *Scriben v. McDonald,* 264 N.C. 727, 732, 142 S.E. 2d 585, 588 (1965). As succinctly stated in *Gay v. Thompson,* 266 N.C. 394, 398, 146 S.E. 2d 425, 428, 15 A.L.R. 3d 983, 987 (1966) : "Negligence alone, without 'pecuniary injury resulting from such death,' does not create a cause of action."

We note that the wrongful death action created by and based on G.S. 28-173 may be brought only "by the executor, administrator, or collector of the decedent." *Graves v. Welborn,* 260 N.C. 688, 690, 133 S.E. 2d 761, 762 (1963), and cases cited. However, the persons entitled to the recovery under the Intestate Succession Act are *the real parties in interest. In re Estate of Ives,* 248 N.C. 176, 181, 102 S.E. 2d 807, 811 (1958). Prior to the 1969 Act, whether the relationship between such persons and the decedent was one of closeness, estrangement or indifference had no bearing upon the amount of the recovery.

G.S. 28-174, as rewritten by the 1969 Act, itemizes elements of damages recoverable in a wrongful death action, but does not purport to identify the persons who are to be the beneficiaries of the recovery. As heretofore, the nature and distribution of whatever recovery is obtained is governed by the provisions of G.S. 28-173.

The 1969 Act, being Chapter 215, Session Laws of 1969, is quoted in full below:

"An Act to Rewrite G.S. 28-174, Relating to Damages Recoverable for Death by Wrongful Act.

"Whereas, human life is inherently valuable; and

"Whereas, the present statute is so written and construed that damages recoverable from a person who has caused death by a wrongful act are effectually limited to such figure as can be calculated from the expected earnings of the deceased, which is far from an adequate measure of the value of human life; Now, therefore,

"*The General Assembly of North Carolina do enact:*

"Section 1. G.S. 28-174 is hereby rewritten to read as follows:

" 'Sec. 28-174. *Damages recoverable for death by wrongful act; evidence of damages.* (a) Damages recoverable for death by wrongful act include:

(1) Expenses for care, treatment and hospitalization incident to the injury resulting in death.

(2) Compensation for pain and suffering of the decedent.

(3) The reasonable funeral expenses of the decedent.

(4) The present monetary value of the decedent to the persons entitled to receive the damages recovered, including but not limited to compensation for the loss of the reasonably expected:

(i) Net income of the decedent,

(ii) Services, protection, care and assistance of the decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered,

(iii) Society, companionship, comfort, guidance, kindly offices and advice of the decedent to the persons entitled to the damages recovered.

(5) Such punitive damages as the decedent could have recovered had he survived, and punitive damages for wrongfully causing the death of the decedent through maliciousness, wilfull or wanton injury, or gross negligence.

(6) Nominal damages when the jury so finds.

(b) All evidence which reasonably tends to establish any of the elements of damages included in subsection (a), or otherwise reasonably tends to establish the present monetary value of the decedent to the persons entitled to receive the damages recovered, is admissible in an action for damages for death by wrongful act.'

"Sec. 2. All laws and clauses of laws in conflict with this Act are hereby repealed.

"Sec. 3. This Act shall not apply to litigation pending on its effective date.

"Sec. 4. This Act shall become effective upon ratification."

The 1969 Act was ratified on 14 April 1969.

In a comprehensive Comment entitled "Wrongful Death Damages in North Carolina," 44 N.C.L. Rev. 402-441 (1966), after examining the wrongful death statutes in all fifty states, the author states: "There are two generally accepted methods of measuring damages caused by wrongful death. The measure used by forty-three jurisdictions is that of loss to the survivors or beneficiaries caused by the death of the decedent. Six states compute damages according to the loss to the estate of the deceased only. Of the jurisdictions using neither of these methods, two states base recovery solely on the culpability of the defendant in causing the wrongful death; one state attempts to measure the damages according to the loss to the decedent himself; and two states use a combination of the loss-to-beneficiaries and loss-to-estate measures." *Id.* at 405-07.

The difficulty encountered when interpreting the 1969 Act is aggravated by the fact that distribution of the recovery in accordance with G.S. 28-173, although appropriate when the recovery is computed on the basis of the loss *to the estate* as under G.S. 28-174 prior to the 1969 Act, *is not appropriate* when as under the 1969 Act the recovery is based largely on losses suffered by particular beneficiaries.

In *Smith v. Mercer*, 276 N.C. 329, 172 S.E. 2d 489 (1970), it was held that the 1969 Act did not apply retroactively to deaths which occurred prior to 14 April 1969. Questions relating to the interpretation of the 1969 Act were deferred until directly presented in subsequent litigation.

The 1969 Act itemizes in paragraphs (1), (2), (3), (4), (5) and (6) the elements of damages recoverable for death by wrongful act.

Although not presently involved, we note that paragraph (6) provides for the recovery of nominal damages "when the jury so finds." This provision supplies a statutory basis which was lacking when *Armentrout v. Hughes, supra,* was decided. Nominal damages and costs may now be recovered if the jury finds that the decedent's death was caused by the defendant's wrongful act but fails to find that such death caused pecuniary loss.

In the present case, the damages which plaintiff seeks to recover are the funeral expenses and items of damages recoverable under paragraph (4).

Paragraph (3) provides for the recovery of "[t]he reasonable funeral expenses of the decedent." Under G.S. 28-173 the "burial expenses of the deceased" are to be paid "out of the recovery." Paragraph (3) appropriately provides that the amount thereof is to be considered an element of damages in determining the amount of the recovery.

Paragraph (4) provides for the recovery of "[t]he present monetary value of the decedent to the persons entitled to receive the damages recovered," including compensation for reasonably expected losses on account of the matters set forth in subparagraphs (i), (ii) and (iii).

The first step to determine the damages recoverable under paragraph (4) is to identify the particular persons who are entitled to receive the damages recovered. Although the exact date of Howard's birth does not appear, the evidence is that he was seventeen years old and unmarried when fatally injured on 26 June 1969. His father, Howard G. Bowen, Sr., who was born 28 September 1925, and his mother, Hazel A. Bowen, who was born 3 December 1927, are the persons who, by virtue of the Intestate Succession Act, are entitled to receive the damages recoverable in the action for his wrongful death. G.S. 29-15(3).

As set forth above, decisions of this Court based on G.S. 28-174 prior to the 1969 Act denied recovery when the evidence failed to show any pecuniary loss under the rule stated in *Bryant v. Woodlief, supra,* and cases cited. Too, often satisfac-

tory evidence of such pecuniary loss was unobtainable, notably in cases involving the death of minor chidren, elderly or handicapped persons, or a married woman whose service as wife and mother consisted of making a home. When the 1969 Act was under consideration, the virtues and value of a wife and mother were rightly extolled and the limitation of the value of her services to out-of-pocket pecuniary loss was decried. This emphasis caused the 1969 Act to bear the legislative nickname of "The Wife Bill." Comment, "The New North Carolina Wrongful Death Statute," 48 N.C.L. Rev. 594, 598 (1970).

Under the express provisions of the 1969 Act, the present monetary value of Howard to his parents by reason of their losses in the respects set forth in subparagraphs (i), (ii) and (iii) of paragraph (4) is recoverable in the wrongful death action. Since the evidence was to the effect that Howard was in good health, there was ample basis for a jury finding that Howard's life expectancy on 26 June 1969, the date of his fatal injury, was substantially greater than the life expectancy of his parents. If the jury so found, recovery for these items necessarily would be limited to the life expectancy of his last surviving parent.

Paragraph (4) provides for the recovery of *the present monetary value* of the decedent *to the persons entitled to receive the damages recovered.* Their recovery is for the loss of their *reasonably expected* (i) net income of the decedent, (ii) services, protection, care and assistance of the decedent, and (iii) society, companionship, comfort, guidance, kindly offices and advice of the decedent.

No rule is prescribed for the measurement or ascertainment of the damages recoverable under paragraph (4). It would be difficult, if not impossible, to formulate a rule of general application for the measurement of such damages. Recovery for these items will vary from case to case according to the age of the deceased and the age of the person entitled to receive the damages recovered and their relationship with the deceased. Since the persons entitled to the damages recovered may have suffered substantial losses on account of these items of damage, we cannot say there can be no recovery for these items of damages because no yardstick for ascertaining the amount thereof has been provided. Damages recoverable under paragraph (4) would be as capable of exact ascertainment as damages for pain and suffering and mental anguish in a personal

Bowen v. Rental Co.

injury action. In recent years, "[i]t has been recognized that even pecuniary loss may extend beyond mere contributions of food, shelter, money or property; and there is now a decided tendency to find that the society, care and attention of the deceased are 'services' to the survivor with a financial value, which may be compensated." Prosser, Law of Torts ¶ 127, p. 908 (4th ed. 1971).

In the present factual situation, Howard may have made no financial contribution to the support of his parents during their active years. It may be that the persons who would receive his net income if he had survived would be a wife and a child or children. During his years in college, and during the earlier years of his career and possible marriage, it may be more likely that financial aid would flow from his parents to Howard rather than from Howard to his parents. Even so, the loss of a son may be a grievous loss and substantially deprive the parents of services such as those described in subparagraphs (ii) and (iii) of paragraph (4).

If the persons entitled to receive the damages recovered were a wife and a child or children, obviously the present value of their monetary loss would involve different considerations. If the persons entitled to the damages recovered were collateral relatives whose contacts with the decedent were casual and infrequent, there may be no basis for the recovery of any significant amount under paragraph (4).

[3] After verdict, Judge Exum was of the opinion, and rightly so, that his instructions with reference to damages recoverable under paragraph (4) were erroneous in that they predicated recovery for these items *solely* on the life expectancy of Howard. As stated above, whatever Howard's life expectancy, there can be no recovery for any of the items in paragraph (4) beyond the life expectancy of his last surviving parent. Hence, Judge Exum's order setting aside, as a matter of law, the jury's answer to the third issue, was correct. Plaintiff's exception thereto is without merit.

Questions relating to paragraphs (1), (2) and (5) will arise only when there is an appreciable interval between the time of injury and the time of death. Such questions are not presented now because electrocution caused Howard's instant death and no issue as to punitive damages was submitted or tendered. Even so, the following observations seem appropriate.

We note that, prior to the effective date of the 1969 Act, the elements of damages set forth in paragraphs (1), (2) and (5) were recoverable *only* in the injured party's right of action; that this right of action survived to his personal representative; that, in such action, the recovery constituted general assets of the estate; and that the applicable statute of limitations was three years, G.S. 1-52(5), while the applicable statute of limitations in a wrongful death action is two years, G.S. 1-53(4).

Paragraph (1) of the 1969 Act provides for the recovery of "[e]xpenses for care, treatment and hospitalization incident to the injury resulting in death," without limitation as to the amount thereof. However, under G.S. 28-173, any amount recovered therefor in excess of five hundred dollars *in a wrongful death action* would not be subject to the debts of the decedent.

Paragraph (2) provides for the recovery of "[c]ompensation for pain and suffering of the decedent." However, under G.S. 28-173, recovery therefor *in a wrongful death action* would not be subject to the debts of the decedent.

Paragraph (5) provides for the recovery of punitive damages. However, under G.S. 28-173, recovery therefor *in a wrongful death action* would not be subject to the debts of the decedent.

Manifestly, a defendant may not be required to pay these elements of damage twice. If the two causes of action are joined in one complaint, each should be stated separately; if separate actions are instituted, they should be consolidated for trial. Unless rendered unnecessary by stipulation, separate issues should be submitted (1) as to whether the decedent was injured by the wrongful act of the defendant, and (2) as to whether the decedent's death was caused by the wrongful act of the defendant. *See Hinson v. Dawson,* 241 N.C. 714, 86 S.E. 2d 585, 15 A.L.R. 2d 333. In a case involving any or all of the items of damages within paragraphs (1), (2) and (5), it would be advisable to submit a separate issue with reference to each of these items. This would provide a basis for subsequent decision as to whether the recovery for these items would constitute general assets of the estate. Although it would seem improbable that the General Assembly intended that recovery for these items should be exempt from liability for the payment of the debts and legacies of the decedent, we defer definitive decision until the subject is further explored in a case in which the question is directly presented.

Questions relating to paragraphs (1), (2) and (5) are not the only difficult questions which will be presented in subsequent cases. Suppose, for example, that under the Intestate Succession Act ten nephews and nieces are the persons entitled to receive the damages recovered in a wrongful death action; and that *one* is the devoted friend and companion of the deceased and suffers loss of support, services, guidance, etc., as the result of his death. While this may be considered in determining the amount of the recovery, under G.S. 28-173 each of the ten would be entitled to share equally in the distribution thereof.

In the context of the present factual situation, we hold that G.S. 28-173 and G.S. 28-174, as rewritten by the 1969 Act, can be reconciled and implemented. However, we cannot say that this can be done in the context of all factual situations that may come before us. We are not at liberty to amend or otherwise rewrite these statutes. In light of the multiple questions and difficulties they engender, it would seem that legislative reconsideration is urgent.

### Defendants' Appeal — Part II

Judge Exum denied defendants' alternative motion for a new trial on the first and second issues. They bring forward for consideration, in the event their Assignment of Error No. 1 should be overruled, assignments of error relating to the first and second issues. After consideration of each of these assignments, we are of the opinion and hold that none discloses prejudicial error.

As applied to the present factual situation, we hold that subparagraphs (ii) and (iii) of paragraph (4) of G.S. 28-174(a) are not unconstitutionally vague and therefore violative of Article I, Section 19, of the Constitution of North Carolina, and the Fourteenth Amendment to the Constitution of the United States, as asserted by defendants.

[4]  Even so, defendants contend that this Court, in its discretion, should order a new trial as to all issues. As pointed out by Justice Walker in *Lumber Co. v. Branch*, 158 N.C. 251, 253, 73 S.E. 164, 165 (1911): "It is settled beyond controversy that it is entirely discretionary with the Court, Superior or Supreme, whether it will grant a partial new trial. It will generally do so when the error, or reason for the new trial, is confined to one issue, which is entirely separable from the others and it is perfectly clear that there is no danger of

complication." *Accord, Johnson v. Lewis,* 251 N.C. 797, 804, 112 S.E. 2d 512, 517 (1960), and cases there cited. Being of opinion that this case falls within the general rule, this Court, in the exercise of its discretion, approves the ruling of the trial court which limits the new trial to the (third) issue of damages.

Defendants have also asserted numerous errors in respect of evidence rulings and instructions relating to the (third) issue of damages. In view of the nature of the error for which the verdict on this issue was set aside, we deem it inadvisable to undertake to discuss defendants' assignments relating to their additional asserted errors on the present record.

Based upon the foregoing, we affirm the decision of the Court of Appeals in respect of plaintiff's appeal and in respect of defendants' appeal.

On plaintiff's appeal: Affirmed.

On defendants' appeal: Affirmed.