John LIVINGSTON, individually and as Administrator of the Estate of David Dean Livingston, deceased, and Jean Livingston, individually, and John Livingston, d/b/a Fayetteville Auto Exchange, a sole proprietorship, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 91–96–CIV–3–H.

United States District Court, E.D. North Carolina, Fayetteville Division.

March 18, 1993.

Bobby G. Deaver, Fayetteville, NC, for plaintiffs.

R.A. Renfer, Jr., Asst. U.S. Atty., Office of U.S. Atty., Raleigh, NC, for defendant.

## ORDER

MALCOLM J. HOWARD, District Judge.

This is an action under the Federal Tort Claims Act ("FTCA") arising out of a September 19, 1990, vehicular accident in which David Dean Livingston received fatal injuries when his car was struck by a government truck driven by an Air Force serviceman. The driver of the truck, Airman First Class ("A1C") Tana Lyn Petersen, subsequently pleaded guilty to state charges of death by vehicle and failing to see before turning from a direct line. The United States does not contest liability and the matter is before the court for determination of damages.

The trial of this action was held on January 21, 1993, in Fayetteville, North Carolina. Following the close of the defendant's case, the matter was taken under advisement. After careful consideration of the evidence presented and the arguments of counsel, it is now ripe for disposition.

## STATEMENT OF THE CASE

Prior to his death, David Dean Livingston ("David" or "decedent") led an active life, was a devoted son to his parents, an active participant in his father's business, and an entrepreneur in his own right. He was born on March 17, 1959, in New York City and

moved to Fayetteville with his parents in 1967. As an adolescent and an adult, he enjoyed a number of outdoor activities including golf and hunting. He was close to his parents growing up, discussed his activities with his mother, shared hobbies with his father, and was active in the Roman Catholic Church with a particular devotion to Saint Jude. At an early age, he began working in the family business, Fayetteville Auto Exchange.

At no time did David spend any appreciable period away from the Fayetteville area such as for military service or the like. Although he considered the possibility of attending East Carolina University in Greenville, North Carolina, he elected to attend Methodist College in Fayetteville in order to remain close to his parents. Following several months of study, he withdrew from school to work in the family business full time.

When David was 21, he moved out of the family home into an apartment but continued to visit his parents often. Later, he purchased a house "around the corner" from Mr. and Mrs. Livingston and would often drop by to help his parents with yard work and whatever else needed to be done around their home. His parents in return visited their son frequently with Mrs. Livingston doing her son's laundry or cleaning on occasion.

Following his college stint, David threw himself into the activities of Fayetteville Auto Exchange. He participated in every aspect of management of the business and his father came to rely upon him for his advice and expertise. David managed the business' Parmly Drive lot for four years until its closure in 1986 after which he returned to the business' main location.

David expressed his intention to take over the family business following his father's retirement and the Livingstons planned on income from the operation to supplement their Social Security benefits.

David was single at the time of his death and had no dependents.

Fayetteville Auto Exchange prospered through much of the 1980's but encountered a steep decline beginning in 1987 and 1988. When times were good, the decedent drew a healthy salary; when times were not, he took a pay cut so that his parents would not experience a large decrease in their income from the business. David's federal tax returns from 1980 to 1989 reflected in part the fortunes of the business:

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1980 | $ 4,250 | 1985 | $22,620 |
| 1981 | 16,520 | 1986 | 22,620 |
| 1982 | 19,345 | 1987 | 15,225 |
| 1983 | 19,520 | 1988 | 3,480 |
| 1984 | 19,520 | 1989 | 435 |

Eventually, David took out a second mortgage on his residence of approximately $50,000, placing the proceeds into the business. At the time of his death, there was no significant equity remaining in his home.

The decedent took an interest in drag racing, constructing his first race car with the assistance of an expert mechanic. He raced with some success in North and South Carolina, earning a "Rookie of the Year" award as well as a number of trophies, some awarded by a race track and others given by family and friends to commemorate a particular event. Despite his successes, racing was not a profitable pastime for David and he reported losses from the activity on his tax returns of $5,622 in 1984, $8,164 in 1985, and $8,282 in 1986, the last year he raced.

In 1988 and 1989 David tried his hand at the convenience store business, taking over a store with a Sunoco franchise in Goldsboro, North Carolina, while working full time at Fayetteville Auto Exchange. The venture produced a $1,061 profit in 1988 and a $5,975 loss in 1989, when he abandoned the enterprise.

Following David's death, John Livingston was appointed administrator of his son's estate on September 24, 1990. Claims were submitted to the Air Force on behalf of the estate for $830,000 for wrongful death and $70,000 for personal injury. John Livingston as proprietor of Fayetteville Auto Exchange submitted a further claim for $2,900 for the loss of the car destroyed in the accident. The military denied the claims in a letter dated September 30, 1991, exhausting the plaintiffs' administrative remedies.

This action was commenced on October 25, 1991, by the decedent's parents, individually, and by John Livingston on behalf of his son's estate, pursuing recovery for wrongful death, emotional distress, and property damage. The pretrial order indicates that John Livingston, d/b/a Fayetteville Auto Exchange, seeks $2,900 for loss of the automobile. The estate and the Livingstons, individually, demand wrongful death damages consisting of $2,187.05 in hospital expenses, $70,000 for decedent's pain and suffering, funeral expenses of $9,012.95, $142,000 for loss of net income, and a total of $730,000 for lost services, protection, care, assistance, society, companionship, comfort, kindly offices, advice, denial of grandchildren, and loss of bloodline. At trial, the plaintiffs further sought hedonic damages.

The United States does not oppose the plaintiffs' assertions concerning hospital or funeral expenses and the parties stipulate that the value of the automobile was $2,900. However, sharp differences exist on the calculation of economic losses and the propriety and determination of hedonic losses.

## DISCUSSION

The matter raises issues concerning the cognizability of several of the claims asserted and the weight to be given to particular evidence introduced at trial.

■ At the outset, there is some confusion over which party is asserting which claim. Comments made by plaintiffs' counsel at trial following the government's motion to sequester witnesses suggest that Mrs. Livingston had been dismissed as a party, but no motion or order of dismissal is in the record. It is clear that under N.C.Gen.Stat. § 28A–18–2, only the personal representative may maintain a wrongful death action and the action must be brought in the name of the estate. *Burcl v. North Carolina Baptist Hospital, Inc.*, 306 N.C. 214, 293 S.E.2d 85 (1982); *Bowling v. Combs*, 60 N.C.App. 234, 298 S.E.2d 754, *petition den.*, 307 N.C. 696, 301 S.E.2d 389 (1983). As a result, the Livingstons, individually, will be dismissed as parties to the wrongful death claim.

■ Mr. and Mrs. Livingston, individually, further assert a separate cause of action for "emotional distress" in the complaint. This count is not mentioned in the pretrial order and is deemed abandoned under Local Rule 25.03(b), E.D.N.C.

■ The FTCA is a limited waiver of sovereign immunity allowing recovery of compensatory damages against the United States for ordinary torts recognized under state law. *See Howell v. United States*, 932 F.2d 915 (11th Cir.1991). Administrative remedies with the relevant federal agency must be exhausted before a complaint can be filed in the district court and the amount sought from the agency sets the upper limit of the recovery in the judicial action. 28 U.S.C. § 2674(a) and (b) (1992).

The plaintiffs seek recovery under N.C.Gen.Stat. § 28A–18–2 (1992), which provides for the recovery of:

(1) expenses for care, treatment and hospitalization incident to the injury resulting in death;

(2) compensation for pain and suffering of the decedent;

(3) the reasonable funeral expenses of the decedent;

(4) the present monetary value of the decedent to the persons entitled to receive the damages recovered, including, but not limited to compensation for the loss of the reasonably expected:

 a. net income of the decedent,

 b. services, protection, care and assistance of the decedent, whether voluntary or obligatory, to the persons entitled to the damages recovered,

 c. society, companionship, comfort, guidance, kindly offices and advice of the decedent to the persons entitled to the damages recovered.

### A. *Pain and Suffering*

■ The plaintiffs contend in their trial brief that David suffered "frightfully" when he realized that a collision was imminent and continued to suffer after the accident until his death a short time later. In its trial brief, the United States maintains that the decedent was comatose throughout the short

period he remained alive following the collision.

No evidence was introduced directly on this point at trial nor was it argued by the attorneys. However, given that the circumstances of the accident and the injuries sustained by the decedent are not in dispute, the court finds it more likely than not that David knew that he was faced with imminent bodily injury before impact and his estate should be compensated accordingly. However, the accident inflicted massive head injuries making it improbable that the decedent was conscious following the collision, ruling out recovery for post-accident pain and suffering.

## B. *Economic Loss*

Economic loss is calculated by the income of the decedent over the greatest of the life expectancies of his survivors, less taxes and consumption. *See Bowen v. Constructors Equipment Rental Co.*, 283 N.C. 395, 196 S.E.2d 789 (1973); *Scallon v. Hooper*, 58 N.C.App. 551, 293 S.E.2d 843, *petition den.*, 306 N.C. 744, 295 S.E.2d 480 (1982). Between the survivors, John Livingston has the longer life expectancy, making his the appropriate measuring life. Based upon N.C.Gen.Stat. § 8–46 and evidence concerning John Livingston's health, habits, and constitution, the court finds that his life expectancy at his son's death was 13.19 years.

The estate relies heavily on the analysis of Dr. Gary R. Albrecht, an economist on the faculty at Wake Forest University. Dr. Albrecht starts his analysis with a comparison of David's duties in the family business with those listed in the Department of Labor's *Occupational Outlook Handbook* and finds that the average salary of such persons is $37,800. Taking into account his father's life expectancy, foregone employee benefits, personal consumption, taxes, and an inflation rate of 4.88%, Dr. Albrecht contends that David's total economic loss is $188,975.94 and that the present value of such loss is $117,042.05.

The United States takes a very different view of the calculation of economic loss, focusing on the decedent's earnings history. Dr. Thomas Havrilesky of Duke University calculates David's average income from 1982 to 1989 to be $16,280 in 1992 dollars. Using a net bequeathal rate of five percent of adjusted gross income, and a ninety-five percent probability of being alive over the next 13.19 years, Dr. Havrilesky projects the total lost past and future benefits at $9,382.

Neither approach is without its drawbacks. The plaintiffs' analysis is based upon data too general to be reliable in this proceeding. As Dr. Albrecht conceded under cross-examination, the salary level obtained from the *Occupational Outlook Manual* is drawn from a sample which included employees of Fortune 500 companies. Indeed, although the estate's estimate is based upon an average salary of $37,800, there is no dispute that the decedent never earned that amount in any year.

The income projections of the United States are more plausible than the plaintiffs' because the historical data more accurately reflects the decedent's income record. However, the government's analysis is inherently conservative because it uses the average of earned income over an eight year period in the past and projects into the future. Although David's income was uneven over the past decade, it is not unreasonable to assume that it would follow a generally upward trend given his age and the improving economy.

## C. *Hedonic Damages*

The plaintiffs' seek recovery for the loss of the enjoyment of life, also known as the loss of the pleasure of life and as hedonic damages. The plaintiffs again rely upon Dr. Albrecht's expertise, based upon valuations used in an Environmental Protection Agency study on the tradeoffs individuals make between the risk of death and compensation for cost-benefit assessment. Daniel M. Violette and Lauraine G. Chestnut, Valuing Risks: New Information on the Willingness to Pay for Changes in Fatal Risks, No. EPA–230–06–86–016. According to Dr. Albrecht, the Violette and Chestnut study estimates a life to be worth between $1.5 and $8 million; if a proposed regulation costs less than $1.5 million per life saved through implementation, then the regulation is promulgated. If, on the other hand, a proposed regulation costs

**606**

more than $8 million, then it is not implemented. Dr. Albrecht states that the pleasure of life equals the value of life less its economic value. Borrowing the value of life estimates from the Violette and Chestnut study, he subtracts the economic value of life, assumed to be $450,000, to produce pleasure of life values ranging from $479,396 to $3,447,088.18.

The United States argues that Dr. Albrecht's analysis is the product of "junk science" and disputes his contention that the value of life methodology is widely accepted as being applicable to wrongful death actions. It notes that according to Dr. Albrecht, the only fact essential to recovery in this case is that a relationship existed between David and the Livingstons. The government contends that calculations on the pleasure of living are simply beyond the scope of economic science and are inadmissible under Fed.R.Evid. 702 and 703.

 Hedonic damages are not proscribed by the FTCA, but their recovery is dependent on state tort law. *Molzof v. United States*, —— U.S. ——, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992). Although recovery for hedonic injury has been recognized in several jurisdictions, it is a question of first impression in this state, requiring a federal forum to put itself in the place of the North Carolina Supreme Court in examining the issue. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Having done so, the court is not convinced that hedonic damages are recoverable in an action under § 28A–18–2 for two reasons. First, although the wrongful death statute is to be construed liberally to permit recovery, no authority exists allowing for damages other than those enumerated in § 28A–18–2.

 Second, recovery in wrongful death actions in this state is based largely on losses suffered by the survivors. *Scallon*, 58 N.C.App. at 558, 293 S.E.2d at 845. Compensation is intended restore the beneficiaries to the same position they would have occupied had there been no death. *Id.* Recovery for any diminishment in the quality of life of the survivors is already addressed in effect under § 28A–18–2(b)(4) b and c. Allowance of separate hedonic damages will result in double recovery.

 Assuming for the sake of argument that hedonic claims are separate claims cognizable in a wrongful death action, Dr. Albrecht's testimony fails to pass muster under the Federal Rules of Evidence. Rule 702 allows testimony by experts if the specialized knowledge claimed will assist the trier of fact in understanding the evidence or determining a fact at issue. In a wrongful death action, recovery under a hedonic theory depends upon the extent of the diminishment of the survivors' pleasure of life. But, as the United States pointed out during cross-examination, the sole basis for recovery under the plaintiffs' hedonic theory is that there was a relationship between the decedent and his parents. Dr. Albrecht's testimony is devoid of any indication of the extent to which the Livingstons' pleasure of life has deteriorated as a result of their son's death.

Furthermore, the plaintiffs' expert bases his opinion on figures provided in the Violette and Chestnut study in arriving at his values of life and the pleasure of life. However, the study is better characterized as measuring the value of avoiding risk. As Dr. Havrilesky observed, the inducements necessary to persuade a person to perform a dangerous activity increase as the certainty of death increases until an infinite inducement is necessary for a person to engage in an activity involving certain death. As a result, the court finds that Dr. Albrecht's opinion neither rests on a reliable foundation nor does it assist the court in determining a fact at issue.

D. *Loss of Bloodline and Denial of Grandchildren*

 The court is unwilling to allow damages for loss of bloodline and denial of grandchildren because the statute does not provide for such claims. Even if it did, such recovery would be very speculative in this case because David had no children, was not married, and apparently had no immediate plans for marriage. As a result, it is impossible for the court to determine with any degree of certainty that the decedent would

have had any offspring had the accident not occurred.

## FINDINGS OF FACT

1. David Dean Livingston died of injuries sustained in a collision between the 1976 Triumph automobile he was driving and a government truck driven by Airman First Class Tana Lyn Petersen, United States Air Force, on September 19, 1990, in Fayetteville, North Carolina.

2. At approximately 7:06 p.m., David was travelling in a southerly direction along Murchison Road and A1C Petersen was travelling in a northerly direction when her truck turned left across Murchison Road and struck the front left quarter of David Livingston's car.

3. The decedent was aware of the impending collision and experienced severe emotional discomfort at the prospect of great bodily injury.

4. David did not regain consciousness following the impact and subsequently died at 7:56 p.m. on September 19, 1990, of massive head injuries sustained in the collision.

5. The failure of A1C Petersen to yield the right-of-way was negligence and such negligence was the proximate cause of the collision and the death of David Livingston.

6. At the time of the accident, A1C Petersen was acting within the scope of her employment.

7. On October 11, 1990, A1C Petersen pleaded guilty to state charges of failing to see before turning from a direct line and death by vehicle.

8. The decedent was survived by his parents, John and Jean Livingston.

9. John Livingston was appointed to administer his son's estate.

10. John Livingston, d/b/a Fayetteville Auto Exchange, was the owner of the Triumph automobile and is entitled to recover its value, $2,900, as a result of its total destruction in the accident.

11. At the time of his death, David Livingston was an unmarried, 31 year old male without offspring or any definite plans of marriage.

12. David Livingston had a very close relationship with his parents and shared a number of activities with them as he grew up and as an adult.

13. The decedent played a significant role in the management and operation of Fayetteville Auto Exchange since coming to work in the family business following high school.

14. David borrowed against the equity in his residence through a second mortgage, placing the proceeds in the business. At the time of his death, the second mortgage had a balance of $50,000 and no significant equity remained in the residence.

15. John and Jean Livingston planned to turn the ownership and operation of Fayetteville Auto Exchange over to the decedent and expected to supplement their retirement with income from the business.

16. The decedent shared these intentions.

17. At the time of his death, David had a life expectancy greater than that of his parents, based upon his health, habits, and constitution.

18. Between the survivors, John Livingston has the greater life expectancy. According to the mortality tables and testimony concerning his health, habits, and constitution, John Livingston had a life expectancy of 13.19 years at his son's death.

19. Pursuant to N.C.Gen.Stat. § 28A–18–2, the court finds that David's estate is entitled to recover:

 a. expenses for care, treatment and hospitalization incident to the injury resulting in death in the amount of $2,187.05;

 b. pain and suffering experienced by the decedent between his realization of the impending collision and impact in the amount of $10,000;

 c. funeral expenses including mortuary costs, burial plot, and one-third of the costs of a family tombstone and a headstone, in the total amount of $9,012.95;

 d. net income of the decedent in the amount of $20,000;

e. the services, protection, care and assistance of David Livingston to his parents in the amount of $75,000;

f. society, companionship, comfort, guidance, kindly offices and advice of the decedent to his parents in the amount of $150,000.

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1346(b), 2674–2680.

2. Venue is proper under § 1391(e).

3. Administrative claims were timely submitted to the Air Force on behalf of the estate for $830,000 for wrongful death and $70,000 for personal injury. An additional claim was submitted by John Livingston, d/b/a Fayetteville Auto Exchange, for $2,900 for loss of the car driven by David Livingston. The military denied the claims in a letter dated September 30, 1991, exhausting the plaintiffs' administrative remedies and setting the maximum recovery in this action. § 2675(b).

4. John and Jean Livingston, individually, cannot recover for wrongful death under N.C.Gen.Stat. § 28A–18–2.

5. The claim for emotional distress is not addressed in the pretrial order and is deemed abandoned under Local Rule 25.-03(b), E.D.N.C.

6. Loss of bloodline and denial of grandchildren are not grounds for recovery under N.C.Gen.Stat. § 28A–18–2.

7. Evidence submitted in support of recovery for hedonic damages is inadmissible for failure to comply with Fed.R.Evid. 702 and 703.

8. Hedonic damages are not recoverable under N.C.Gen.Stat. § 28A–18–2(b).

## CONCLUSION

Based upon the foregoing findings of fact and conclusions of law, it is hereby ORDERED that John and Jean Livingston, individually, are DISMISSED as parties to the wrongful death claim; that the claims for emotional distress, loss of bloodline, and denial of grandchildren are DISMISSED; that

judgment be entered against the defendant United States in favor of John Livingston, d/b/a Fayetteville Auto Exchange, in the amount of $2,900 and that judgment be entered against the defendant United States in favor of John Livingston as Administrator of the Estate of David Dean Livingston in the total amount of $266,200.