**In re AIR CRASH DISASTER AT CHARLOTTE, NORTH CAROLINA ON JULY 2, 1994.**

Karen FORCHT, Plaintiff,

v.

**UNITED STATES of America, Defendant.**

C/A No. 3:96–1118–17.

United States District Court,
D. South Carolina,
Columbia Division.

April 8, 1997.

Marc Moller, Lori B. Lasson, Kreindler & Kreindler, New York City, for plaintiffs.

Patrick E. Bradley, Douglas Coleman, U.S. Dept. of Justice, Torts Branch, Civil Division, Washington, DC, Raymond E. Clark, Asst. U.S. Atty., Columbia, SC, for U.S.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

JOSEPH F. ANDERSON, Jr., District Judge.

### INTRODUCTION

The present action was brought under the Federal Tort Claims Act, ("FTCA") 28 U.S.C. §§ 2671–80, by a surviving flight attendant who was on board USAir Flight 1016 when it crashed on July 2, 1994, near the Charlotte Douglas International Airport. In this action, plaintiff, Karen Forcht, seeks damages to compensate for physical and emotional injuries resulting from that crash. Defendant does not contest the fact that plaintiff suffered serious injuries but does

challenge the extent of these injuries and their likely duration. Plaintiff contends that her actual damages exceed $2.5 million; defendant's argument suggests damages of approximately $250,000 or less.[1] For the reasons which follow, the court will award $966,630.

Jurisdiction in this matter is vested in this court by 28 U.S.C. § 1346(b). Under the FTCA, the United States may be held liable for personal injury caused by the negligent act or omission of employees of the United States acting within the scope of their employment under circumstances where the United States, if a private person, could be responsible to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. §§ 1346(b) & 2674.

The United States has admitted that its negligence was a proximate cause of the accident. Accordingly, the sole issue for trial was the amount and extent of compensable damages sustained by plaintiff.[2]

This action was tried to the court on December 2 through 4, 1996, in conjunction with the damages trial in the related case of Richard Demary (C/A No.: 3:96–1117–17). Both cases involved injury to flight attendants in the same air disaster, with a principal element of damages in both cases being severe post traumatic stress disorder ("PTSD"). The evidence and witnesses in the two cases were overlapping. At the request of all parties, therefore, the court allowed for evidence in each case to be incorporated into the other to the extent relevant.

After hearing testimony, receiving evidence, reviewing the exhibits, reading briefs of counsel, and studying the applicable law,

1. Plaintiff contends that Ms. Forcht's emotional injuries will continue such that she will lose all ability to earn a living resulting in over one million dollars in lost income (at present value). Defendant, by contrast, argued that future economic losses would range from $135,000 to $156,000. Although defendant did not suggest a specific total dollar figure, it would appear that defendant's suggested total damages would relate to plaintiff's figure in approximately the same proportion as the future earnings loss, that is, roughly $200,000 to $250,000 compared to plaintiff's $2.5 million.

2. Under North Carolina law, which both parties concede is applicable, the United States is jointly and severally liable with any other tortfeasor for plaintiff's damages. See Price v. Seaboard Air Line R.R. Co., 274 N.C. 32, 161 S.E.2d 590, 599 (1968). Plaintiff is, however, barred by the worker's compensation laws from bringing an action against her employer, USAir, for any negligence on its part in causing the crash.

this court makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent any findings of fact constitute conclusions of law, they are adopted as such: to the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

Prior to filing this action, plaintiff properly complied with the requirements of 28 U.S.C. § 2675 with regard to the administrative claim procedure of the Federal Tort Claims Act. This court, therefore, has jurisdiction over the parties to, and the subject matter of, this action.

Plaintiff, flight attendant with USAir, was on board USAir Flight 1016 when it crashed on July 2, 1994, near the Charlotte Douglas International Airport. Plaintiff was working on Flight 1016 and was acting within the course and scope of her employment with USAir when the crash occurred.

The United States has admitted that the negligence of its air traffic controllers was a proximate cause of this air disaster, which claimed the lives of thirty-seven people and injured twenty others including the plaintiff.

### General Background

Ms. Forcht was 27 years old on the date of the accident. She was single and had never been married. Ms. Forcht has a college degree in business administration and prior experience in sales. At the time of the crash, she had been employed by USAir as a flight attendant for approximately two years. By all accounts, Ms. Forcht was doing well in her career as a flight attendant and enjoyed it very much. She also enjoyed the fringe benefit of frequent travel. Ms. Forcht testified that she had intended to remain an active flight attendant for the rest of her normal working life.

### The Crash

On the day of the crash, Ms. Forcht had helped a number of passengers to their seats. She recalls many of them vividly, including a grandmother who was traveling to a family reunion with her son and grandson. Plaintiff

moved these passengers from their originally assigned seats in the very rear of the plane so that the grandson would be able to see out of a window. Plaintiff also recalls a mother with a baby. Plaintiff was waving to the baby shortly before the crash.[3]

The crash occurred during a go-around maneuver after a failed landing attempt. Plaintiff was in her seat at the very rear of the plane. After two impacts, one severing the plane in half, a fireball swept through the cabin. Plaintiff covered her face with her hands to protect herself from the fire. Her hands and arms were severely burned as a result. During the crash, plaintiff saw the ceiling collapse and saw people flying through the air.

As a result of the impact and fire over the wing sections, all but the nose cone and tail cone of the plane, with a few passenger seats in each area, were destroyed. Most of the survivors were in the very front or very rear of the plane. Neither the family that Ms. Forcht moved forward to allow the grandson a better view, nor the baby to whom she had been waving, survived the crash.

Immediately after the crash, plaintiff recalls removing her seat belt and standing. Her first thought was that everyone else was dead. She attempted to open the rear door of the plane. She was unable to do so and called for assistance. Although she was ultimately able to open the door part way, she had to close it because of fire and smoke. She then managed to escape by crawling through a break in the fuselage.

Plaintiff is not sure if she recalls fully how she got out of the plane, but she does recall finding herself on the grass. She began walking around, trying to get oriented. During this time she realized that the front of the plane was missing. She recalls seeing the dead bodies of passengers still strapped in their seats.

Ms. Forcht was observed by a fellow flight attendant, Richard DeMary, shortly after the crash. Mr. DeMary testified that Forcht's skin appeared to be melted from her hands.

3. Plaintiff's pre-disaster contact with these passengers is significant due to the catastrophic injury later suffered by these passengers and the resulting emotional impact on plaintiff.

Her hosiery appeared to be melted off or into her skin. Her eyes were glassy, and she appeared to be in despair or shock.

Plaintiff and her fellow flight attendant, Mr. DeMary, were transported together to a hospital in Charlotte. She remained hospitalized in Charlotte for several days before being air transported to Pittsburg. During that time, plaintiff was treated for burns described more specifically below.

### Physical Injuries

Ms. Forcht suffered superficial and partial thickness burns over eleven percent (11 %) of her body. The burns covered portions of her hands, arms, left leg, and a small portion of her face.[4] No skin grafts or operations were or will be required as a result of the burns. Ms. Forcht did, however have to undergo debridement (a procedure for removing dead skin from the burn areas) for several days following the accident. This procedure has been described by the treating personnel and plaintiff as an excruciating and lengthy process.[5] The process was most painful on the second day of hospitalization and became progressively easier as the days went on.

Ms. Forcht's manner and actions during this process indicated she was suffering extreme pain. She was given pain medications including Demoral before the treatments. She was also given a patient-controlled administration pump ("PCA pump"), which allowed her to self-administer additional pain medication up to a maximum dosage. She was able to achieve good pain control with the PCA.

Plaintiff was also given range of motion therapy to prevent her fingers, which were

the most severely burned portion of her body, from fixing in a contracted position. These burns also required individual wrapping of the fingers and splinting. These processes were also painful.

Dr. Goldfarb, who treated Ms. Forcht during her ten month follow up period, indicated that the burns were partially "healed," in the sense that an initial layer of skin had grown over the wounds that would prevent major risks of infection, by July 12, 1994 (ten days after the accident). Nonetheless, he indicated Ms. Forcht's burns continued to be unsightly and in various stages of healing for several months. Ms. Forcht was seen by Dr. Goldfarb four times over the ten months following the accident. During this time, she had to wear specially fitted "jobst" garments (also called "jobs skins") at all times to assist in the healing process on her hands, arms, and knees.

After July 12, 1994, the burns themselves did not restrict Ms. Forcht's abilities significantly in that she had full range of motion subject only to the limitations imposed by the jobst garments. On May 12, 1995, Dr. Goldfarb indicated in his records that plaintiff was able to return to work without restrictions. In testimony he indicated that this related only to impairments caused directly by the burns and did not address plaintiff's mental state.[6]

The long term emotional impact of the burn scars is, in Ms. Forcht's case, greater than the physical evidence of the scars would suggest. Although any marks remaining on her face are, at most, barely discernable, she is very concerned about them. Similarly, her knee has a darker area, a condition that

---

4. The doctors at Presbyterian Hospital in Charlotte, which initially treated Ms. Forcht (from July 2–7, 1994), indicated that the burns covered 5–10% of the body surface area. William Goldfarb, M.D., who treated Ms. Forcht for a more extended period and not under the pressure of a mass disaster situation testified by videotape that the burns covered 10–11% of the body surface area. Dr. Goldfarb treated Ms. Forcht over a ten-month period beginning when she was seen at West Penn Hospital on July 7 or 8, 1994, after being airlifted from Presbyterian Hospital in Charlotte.

5. Although the process itself might require no more than thirty minutes, the patient's inability

to withstand the pain generally requires frequent breaks which, in Ms. Forcht's case, lengthened the process to two and one half to three hours twice a day.

6. During his treatment of Ms. Forcht for burns, Dr. Goldfarb did not note any psychological impairments so severe that he felt hospitalization was required. At one of the early visits, however, he did ask plaintiff if she would like a referral to a psychologist or psychiatrist. By this time plaintiff was already seeing a mental health professional and so advised Dr. Goldfarb. He did not follow up further in regard to mental health issues.

worsens in the sun. Plaintiff testified that people come up to her and "try to wipe if off," thinking it is a dirty spot. Plaintiff is then asked how she got the mark. Similarly, plaintiff's forearms apparently show a discoloration, at least in cold weather.

None of these scars are particularly noticeable and they would probably detract little, if at all, from plaintiff's physical appearance to the average observer. Nonetheless, they are of significant concern to plaintiff who views them as significant impairments to her appearance as well as reminders of a horribly traumatic experience.

### Emotional Injury

Ms. Forcht's predisaster personality was described by a longtime friend and by a family member as fun, happy, vivacious, spontaneous, and carefree. She was very self confident and active. She enjoyed traveling, swimming, shopping, and going to clubs. She seldom cried.

Since the disaster, Ms. Forcht's personality has changed completely. She is very sad and cries frequently. She is extremely reluctant to go out in public, spending most of her time at home. If she does go out, she must be in control of the situation. For instance, she is uncomfortable with allowing others to drive. Ms. Forcht also minimizes the length of any trips away from home, cutting them unnaturally short. She does communicate frequently by phone with one long-time friend (four to five times a week) but the conversations frequently focus on plaintiff's continuing nightmares. Her nightmares replay the images she saw of fire, bodies, trapped children, and severed body parts, as well as the emotions she experienced of horror, helplessness, and feeling trapped. Ms. Forcht cries in virtually every one of these conversations.

Since the disaster, Ms. Forcht is easily distracted and loses her train of thought frequently, primarily due to intrusive thoughts of the crash. She is sometimes afraid to remain at home alone at night. She is unable to handle even normal stresses of day to day life. Even small set backs, such as misplaced papers or keys, cause her to break down.

Ms. Forcht experiences frequent, almost nightly, nightmares which often repeat the crash, forcing her to again experience its horror. She sees the faces of the young child she moved and of the baby she waved to, both of whom were killed. Other times she experiences nightmares that repeat only the emotions, with frequent themes of being trapped in terrifying situations or seeing body parts of people she knows.

While her emotional trauma is clearly quite severe, plaintiff is not wholly debilitated from all normal activities. She has renewed an old friendship that has led to an engagement. Ms. Forcht and her fiancé have established a home together. Plaintiff is able to perform a reasonable degree of services in maintaining the home and a garden, and in caring for a small dog. She has assisted in at least some decorating and purchasing decisions. She has also been able to participate in a class.[7] Plaintiff has also taken a few short trips with her fiancé. Within a year of the crash, she was apparently able to go out at least occasionally, as she renewed her friendship with her now-fiancé when they met at a coffeehouse.

Ms. Forcht is, however, very concerned about the effect of her emotional condition on her planned marriage. In particular, she is concerned that her fiancé will become tired of her moodiness and frequent crying. She is also concerned that her fiancé may ultimately leave her because she is very reluctant to travel and afraid to have children, for fear of losing them.

Throughout her testimony, plaintiff had difficulty communicating with the court due to her highly emotional state. She cried throughout her testimony, frequently apologizing for her inability to control her emo-

---

7. Among the courses Ms. Forcht has taken are several relating to aircraft. These include a course on aircraft mechanics and one or more ground courses on aircraft instruments and private plane piloting. Ms. Forcht does not, however, intend to ever pilot a plane. Rather, she has apparently taken these courses in some effort to "make planes safe." *See* Report of Dr. Nassar at 10 & 15. Prior to the crash Ms. Forcht apparently had taken flying lessons with the hope of one day becoming a commercial pilot. Nassar Report at 12.

tions. She rejected all offers to break, however, repeatedly stating that she wanted to get the testimony behind her. The defendant does not suggest that the depth of emotion plaintiff displayed was not genuine. However, the expert witnesses who observed Ms. Forcht's testimony agreed that this was not her normal daily state. Rather, the experience of giving testimony was a particularly emotional experience, described by experts for both sides as "cathartic."

Since shortly after the crash, plaintiff has been seeing a psychologist, Dr. Cheryl D. Pierce, on a weekly basis, and occasionally more often. Plaintiff clearly has a very positive, trusting relationship with Dr. Pierce, which should maximize the potential for treatment.

In her initial meetings with Dr. Pierce, plaintiff was emotionally volatile, very tearful, anxious and complained of intrusive thoughts of the crash. Dr. Pierce observed that plaintiff was irritable, impatient, had difficulty concentrating, had difficulty finding words, and had difficulty with her memory. Plaintiff exhibited significant fear for the future, including fear of losing control of her mind. Plaintiff also exhibited an exaggerated sense of unfairness and was especially fearful of the disapproval of others and potential abandonment. Dr. Pierce describes plaintiff's general behavior as very inactive. Although plaintiff has shown some improvement over time, she continued to exhibit many of these symptoms even as of the time of the trial, more than two years since the disaster.

Plaintiff is generally upset and cries during every session. Dr. Pierce indicated that plaintiff "prepares for sessions" and is making a genuine effort to deal with her emotional problems. Plaintiff's dreams are a frequent topic of discussion. During her sessions with Dr. Pierce, plaintiff reports frequent dreams with recurrent themes that are bizarre and grotesque, such as dreams of dismembered bodies, and involve either being out of control or being in excessive control. The dreams often involve pursuit, violence, helplessness, loss, and guilt. Dr. Pierce has diagnosed plaintiff as suffering from Post Traumatic Stress Disorder with depression. As discussed below, defendant does not challenge the fact that Ms. Forcht suffers PTSD with depression. Defendant's challenge is to the current level of severity and the likelihood of near full recovery in the future.

Dr. Pierce confirmed that plaintiff's in-court testimony was not a typical representation of plaintiff's normal emotional state. Instead, it represented her current inability to handle stressful situations. Dr. Pierce described plaintiff's opportunity to testify as a cathartic and validating, albeit obviously painful, experience.

Dr. Pierce described plaintiff's present plan to marry as positive in some ways as it demonstrates that plaintiff is trying to move forward with her life. Dr. Pierce was concerned, however, by plaintiff's ambivalent attitude. That is, plaintiff desires the normal experiences of marriage, children, home, and friends, but is unable to feel emotions such as love as she should be able to. Plaintiff also lacks the sense of confidence and security that would normally be expected as she approaches marriage. In regard to children in particular, plaintiff has conflicting feelings as she desires to have children but is overwhelmed by the potential for losing a child.

Dr. Pierce attributes each of these problems to plaintiff's experience in the crash. As a result of the crash, plaintiff's self-image has changed completely. She feels she should have done more faster and that she is responsible to some degree for the level of injury. Plaintiff also has an excessive fear of abandonment or rejection and views her physical scars as very noticeable.

Dr. Pierce does not believe plaintiff can ever fully regain her precrash personality or self image. She also feels it is most unlikely that plaintiff can ever recover to the point that she could handle her prior or any similar job, particularly because such a position would involve flying and dealing with potentially stressful situations. Nonetheless, Dr. Pierce was "hopeful" that plaintiff might recover to a significant degree.

Dr. Pierce's opinion at the time of the trial was somewhat less hopeful than it was at her deposition one year earlier. The primary

reason was plaintiff's failure to make significant progress in the last year of treatment. Nonetheless, plaintiff has shown some improvement during the time Dr. Pierce has worked with her. Plaintiff generally has improved her control, is better able to think clearly, and her depression has generally improved, although it varies in intensity.

Dr. Pierce has, in the past, treated other crew member crash victims who were ultimately able to return to their prior jobs. One of these was treated for one and one half years and the other for two to three years. Dr. Pierce felt, however, that these crew members were not as severely damaged as plaintiff by their experiences.

Regarding plaintiff's current work ability, Dr. Pierce testified that, if employed, plaintiff would be inconsistent in her ability to follow directions and to meet deadlines. She would be unable to handle stress or any environment she perceived as threatening or unsafe. She would be difficult to work with because she is highly emotional, crying frequently and expressing inability to cope with any challenging task.

At present, plaintiff is attending one math class four days a week. In this relatively controlled environment plaintiff is able to manage with some difficulty. According to Dr. Pierce, plaintiff is able to manage the class by performing tasks over and over, taking several times longer than other students. Plaintiff has taken the same class twice, the second time for credit. In short, attending the class may be a positive step forward for plaintiff, and may lead to greater healing, but it is not indicative of an ability to handle part-time or other work at this time.

Plaintiff's expert witness psychiatrist, Dr. Paul Nassar, initially met plaintiff in October 1995, over a year after the accident. He spent approximately five hours with plaintiff to establish a sufficient relationship so that plaintiff would be able to share the details of her experience. He later interviewed her by phone in October 1996, shortly before the trial. He also reviewed her treating psychologist's records before that time. Based on his initial evaluation, Dr. Nassar diagnosed

plaintiff as suffering chronic (meaning long-term) post traumatic stress disorder with an accompanying mood disorder, depression.[8] He attributes the cause of plaintiff's problems to the crash and survival experience. Dr. Nassar's opinion was that plaintiff will not recover fully from the PTSD and that it will severely impact her ability to earn a living for the rest of her life.

Dr. Nassar testified that Post Traumatic Stress Disorder is a group of symptoms that occur when a person is so overwhelmed that her ability to cope is broken down. The disorder has both psychological and biological components. In plaintiff's case, it was brought on by the sense of imminent harm and the inability to control the situation. The biological effect involves permanent changes to the pathways taken by signals within the brain. Among the symptoms that Dr. Nassar described which commonly result from PTSD are changes in the adrenaline system, hypersensitivity to certain compounds, and changes in the body's seratonin levels (which control the sense of well being as well as the pain threshold).

Dr. Nassar opined that plaintiff associates her own preaccident actions with the injury and death to passengers, feeling that she was somehow responsible for their deaths. In other words, her feelings of horror and despair are further exacerbated by extreme feelings of failure and guilt because she was unable to save the many passengers who died. This conclusion is consistent with the court's observations of Ms. Forcht and her testimony. While there is no reason to believe that there was anything further Ms. Forcht could have done to protect these passengers, her feelings are, nonetheless, very real.

Plaintiff is also taking medications to aid in her recovery and to minimize her symptoms. She has been taking an antidepressant since January 1995. She also relied on sleeping pills from sometime after the accident until May 1996.

Plaintiff states that she would like to return to work but does not feel that she can,

---

8. Dr. Nassar's report, which contains a detailed description of his observations of plaintiff and the basis of his opinion, was admitted without objection. Plaintiff Ex. 44.

due to her emotional state. She had intended to have children, but had also intended to maintain her career after having children to insure continued independence. She is now uncertain whether she will be able, emotionally, to have children.

Dr. Nassar testified that plaintiff has a poor prognosis for recovery. He bases this opinion on the persisting severe PTSD symptoms despite over two years of therapy and appropriate use of medications. For example, plaintiff continues to be unable to see positive events, such as her upcoming wedding, for what they are. Instead, she focuses on the wedding, or other positive events, as events the passengers who died in the crash will never be able to experience.

Dr. Nassar testified that plaintiff will most likely continue to be severely affected by the crash. For example, in moments of stress or danger, she will frequently re-experience feelings and memories from the crash. In his view, her sense of security was shattered by the crash, and she is unlikely ever to be able to rebuild it. He described plaintiff as "driven." She desires to work and is ashamed that she does not. She wants very much to lead a normal life and attempts to do so. However, she experiences even minor tasks as major hurdles, suffering severe levels of anxiety in accomplishing many otherwise simple or routine tasks.

Considering plaintiff's current emotional state, Dr. Nassar did not believe she could handle a job. She would, at present, be unreliable as to absences, be easily distracted, be highly emotional, be unable to deal with others, and exhibit behaviors such as frequently apologizing and breaking down when minor difficulties are encountered.

Dr. Nassar was hopeful that plaintiff would improve with further treatment, would be able to tolerate more stress, and possibly be able to handle some employment in the future. However, for the foreseeable future, he felt plaintiff would be unable to handle even simple jobs. While he believed there was hope for future part-time employment, he, nonetheless, felt that plaintiff would probably remain unemployable.

Dr. Nassar believed that ongoing treatment was essential to reduce plaintiff's day-to-day symptoms and to allow her to learn coping skills. He anticipated that Ms. Forcht will have exacerbations and remissions as the years proceed and needs to continue with a therapist she trusts, such as her present treating psychologist, quite likely indefinitely. From time to time, plaintiff will likely also need some adjunctive pharmacological therapy, requiring a degree of involvement and oversight by a psychiatrist. Dr. Nassar testified that Dr. Pierce's hourly rate is $90 an hour while his is $175 per hour.

Plaintiff also offered a vocational expert, Dr. William W. Stewart, whose opinion as to plaintiff's employability was based largely on the record and opinion of Doctors Pierce and Nassar. Dr. Stewart also gave plaintiff several tests and interviewed her for a relatively short period of time.

From the tests he administered, Dr. Stewart concluded that plaintiff had no high interest areas and only one low-average interest area. The raw score of her "life situation survey" indicated a low quality of life at the present. Plaintiff's responses reflected a satisfaction with her prior life and a desire to be as she was before the disaster. The results of a depression survey were indicative of extreme depression.

Dr. Stewart did not rely solely on these tests, but compared them and his impressions from his interview to the records of Doctors Nassar and Pierce. He found the results to be consistent and found no evidence that plaintiff was malingering or seeking some form of secondary gain. Dr. Stewart's interview with plaintiff revealed many of the same behaviors and sleep difficulties described by Dr. Pierce.

Dr. Stewart found the intrusive dreams to be significant for vocational purposes because they would interfere with sleep and, therefore, with her ability to concentrate and function on the job. In Dr. Stewart's view, plaintiff is wholly unemployable at the present time and is "not anywhere close" to being placeable. Relying on the predictions of Doctors Pierce and Nassar as to plaintiff's prospects for improvement in the future and the duration of her present difficulties, he

felt plaintiff's future prospects were also very poor.[9]

Assuming a degree of improvement in plaintiff's condition, Dr. Stewart believed that this would likely improve plaintiff's quality of life but would probably not be sufficient to make her a reliable worker on a sustained basis. As he put it, it would require very significant and profound improvement before plaintiff would be employable.

Dr. Stewart testified that the longer plaintiff was out of work, the worse her prospects for return would be. Any failed attempts at return to the work force would also likely exacerbate the problems in returning to work. By contrast, Dr. Stewart also testified that a successful return to work can be therapeutic for a person with PTSD.

Regarding possible job options for the future, Dr. Stewart testified that it was unlikely plaintiff would be able to be self employed because she could not handle a job involving stress or deadlines. He believed that even jobs normally not considered "stressful" might well be excessively stressful for a person with plaintiff's level of PTSD (for example word processing with its output pressures and deadlines).

Defendant offered Dr. John Wilson, a leading expert in the field of Post Traumatic Stress Disorder research. Dr. Wilson met with plaintiff for two hours and gave her a number of standardized tests. He agreed that plaintiff currently suffers chronic post traumatic stress disorder with depression as a result of the air disaster. In his view, plaintiff clearly suffered a devastating injury with physical injury to her nervous system as well as emotional injury. On a ranking of 0 to 100, with 0 indicating the worst condition (a person who must be hospitalized or committed), Dr. Wilson presently rates plaintiff as a 50–that is, as having severe to moderately severe emotional problems. In his opinion, plaintiff will never be able to return to a career as a flight attendant.

Dr. Wilson did, however, believe that plaintiff could return to work at the present time,

working three to four hours a day, five days a week, under highly specific conditions. Those conditions would include: 1) high structure with no ambiguity in the job functions, 2) low stress, 3) tasks with low complexity, and 4) a high level of autonomy and control by plaintiff. Under these circumstances, Dr. Wilson believes the job would have a therapeutic effect.

Dr. Wilson did not, however, identify any jobs that would satisfy these conditions other than suggesting an in-home computer business as one possibility. Neither did he testify to the actual availability of any such jobs. He testified that success in a return to the workforce under the above conditions would have a therapeutic effect, but conceded that any failure would most likely intensify plaintiff's anxiety and PTSD symptoms. In the future, after another two years of recovery, he felt plaintiff would not need such a carefully structured work environment.

Dr. Wilson indicated that it was possible plaintiff could eventually achieve her pretrauma status, but nonetheless indicated that the trauma would in some manner be with plaintiff for the rest of her life. As he put it in an authoritative book he authored and in testimony, PTSD leaves a "scar on the soul." PTSD victims learn to cope, but the scar is always there. He also agreed that the continuation of plaintiff's symptoms at their present level for over two years made treatment "more complex."

With time and treatment he believes plaintiff's symptoms will abate or stabilize, and she will ultimately be able to integrate the experience into her life so it would not be so distressing. He predicts that plaintiff will learn to cope effectively with the symptoms, so that the memories no longer invade her thoughts and sleep, and she will be able to have a happy, normal life. Nonetheless, he conceded that he could not be sure plaintiff will recover. While there are various positive factors working in her life, there are many unknowns, such as whether her marriage will occur and whether it will be successful. Even with recovery, Dr. Wilson

---

**9.** Dr. Stewart testified that, as a general rule, employability is more affected by emotional than physical impairments because the former are the more difficult for the employer and fellow employees to adjust to.

conceded that relapses were possible. He indicated relapses could be brought on by any significant traumatic event such as witnessing a disaster, losing a spouse, or injury to or loss of a child. Plaintiff will permanently be more vulnerable to future negative events as a result of this crash. Whether plaintiff will suffer a relapse cannot be known, nor can the extent of any relapse.

In Dr. Wilson's opinion, plaintiff should be able to achieve "recovery" with another two years of therapy. In particular, he believes having the litigation behind her would allow her to close this chapter of her life and focus her energies on improvement. As did the other experts, Dr. Wilson described plaintiff's courtroom demeanor as a cathartic reaction, that is, a discharge of built up emotions. He saw plaintiff's engagement, her attempt to return to school, her positive relationship with her mother and friends, and her preaccident energy to be positive factors suggesting future improvement was likely.

Dr. Wilson agreed that PTSD has biological aspects. However, most of the studies have focused on survivors of long term, multiexposure events (e.g., holocaust or war veterans). These victims showed increased levels of certain hormones in the blood or urine that are indicative of changes in neurotransmition.

Dr. Wilson agreed that plaintiff was suffering depression as one aspect of her PTSD. In his opinion the depression had lessened in severity in the years since the accident. He acknowledged that plaintiff feels significant loss, especially of her "old self." In his opinion, however, plaintiff will recover from these symptoms as she recovers from or learns to cope with her PTSD.

### Economic Loss

Plaintiff offered Dr. Oliver Wood as an expert economist to predict the level of plaintiff's economic losses. Dr. Wood based his predictions on the testimony of plaintiff's experts that plaintiff was unlikely to be employable in the future. Dr. Wood based his calculations on an expected total life expectancy of 42.66 years after the date of trial (to age 72.10) and an assumption that plaintiff would have worked to her Social Security retirement age of 67 (an additional 37.56

years after the trial), but for the accident. Using plaintiff's average flight hours and status (e.g., enhancements for night pay and lead flight attendant) for the year before the crash, and schedules for future pay raises set out in existing union contracts, with various adjustments for taxes and offsets as well as benefits lost, Dr. Wood concluded that Ms. Forcht would suffer lifetime post-trial losses of $1,010,460 (present value).

By contrast, defendant's expert economist, Dr. J. Buehler, based his calculations on a significantly earlier retirement age of 54.9, in the absence of the crash, based on 1986 Department of Labor work life expectancy tables. Dr. Wood rejected this testimony as does the court because it ignores changes in the Social Security retirement age and other demographic changes since 1986 likely to continue into the future. Under this scenario, Dr. Beuhler calculated plaintiff's pre-disaster lifetime earnings at a present value of $768,272. Dr. Beuhler offered an alternative calculation that assumed a more general retirement age of 61.3 years and reflected lifetime earnings of $940,439, but for the disaster. The majority of the difference between Dr. Wood's projection and Dr. Beuhler's, to this point, reflects different presumptions regarding the number of years plaintiff would remain in the work force.

While Dr. Wood's analysis stopped after projecting pre-disaster expectations of future earnings, based on a presumption that plaintiff would, more likely than not, remain unemployable, Dr. Buehler reduced the above figures based on a presumption that plaintiff is currently able to work part-time (20 hours per week at $7.00 hour) and would be able to regain full employment within two years. As to the later, he presumed plaintiff would obtain a salary competitive with recent college graduates with four year business degrees. Based on these further presumptions, Dr. Beuhler calculated plaintiff's lifetime economic losses to have a present value of $135,011 (assuming the shorter work life expectancy) or $156,860 (assuming the longer work life expectancy).

Although plaintiff's and defendant's experts varied significantly in their basic as-

sumptions, their methodologies of calculating loss were very similar. Having reviewed all of the evidence, this court makes the following findings regarding the proper assumptions to be made.

Had the crash ·not cut short her flight attendant career, Ms. Forcht would have continued in this position or changed to another position with similar earning capacity relative to the years of service until at least age 65. Due to the disaster, plaintiff has been unemployed and remains unemployable at the present time. Her lost pretrial earnings are stipulated at $31,130.00.

The court rejects defendant's conclusions that plaintiff was employable at the time of trial and that she will be employable, competitive with new business graduates, in two years. The court also rejects plaintiff's conclusion that she will never again be employable. Rather, as discussed in more detail below, the court finds that plaintiff's future employment will, more likely than not, be severely limited such that her lifetime earnings capacity is reduced by fifty percent.[10]

### QUANTIFICATION OF DAMAGES

### Medical and Counseling Expenses:

■ Plaintiff does not seek recovery for medical and counseling expenses incurred from the time of the crash until the trial. She does, however, seek to recover the expenses of continued treatment of the PTSD and related symptoms. This court concludes that plaintiff will need long term continued treatment to aid in her recovery. It is more likely than not that plaintiff will continue to need routine sessions with the treating psychologist weekly for the near future but decreasing to semi-weekly and then monthly in future years. Some degree of occasional treatment may be necessary off and on for the remainder of her life, an estimated 42.66 years. At the rate of $90 per hour in current dollars,[11] the court concludes that plaintiff· is entitled to $40,400 [12] in damages to compensate for these future medical expenses.

In addition, a certain degree of oversight by a physician trained in psychiatry is likely to be necessary. The court concludes that such oversight would average at least one to two visits annually for the next two to ten years with sporadic visits thereafter. Given a roughly forty-three year remaining life expectancy, the court concludes that this will likely total ninety visits. At the current rate of $190, the psychiatric visits would total $17,100. Therefore, probable total future medical expenses total $57,500.

### Lost Income:

■ The parties have stipulated that the income lost from the time of the incident to the time of trial was $31,130.82. The amount of income included is less than it otherwise might have been due to USAir's continued payments of certain wage amounts in addition to workers compensation payments.

Considering the testimony of the plaintiff, and the experts of both parties, this court finds as follows: Plaintiff is presently unemployable. At some point in the future, the court finds it is more likely than not that plaintiff will be able to return to at least part-time employment.

While it is possible that plaintiff, particularly through extraordinary effort, may be able to return to greater employment in the

10. At the conclusion of oral argument in this case, both parties agreed that the court need not recite in its order its analysis of the individual factors and calculations that resulted in the court's final determination of lost future earnings. Therefore, while the court has considered all the factors discussed by the experts in the conclusion of law contained in this order, that analysis is not repeated here.

11. The court has presumed that the inflationary factor will be balanced out by reduction to present value and has, therefore, used the current dollar value as an approximation of the future medical cost, reduced to present value.

12. This figure is arrived at as follows:

| | | |
|---|---|---|
| Ten years with an average of bimonthly treatments @ $90 each | = | $21,600 |
| Ten years with an average of monthly treatments @ $90 each | = | $10,800 |
| Sporadically during remainder of life | | $ 8,000 |
| | | $40,400 |

future, this court is constrained to conclude that more likely than not plaintiff will continue to be unemployed or only minimally employed for a significant number of years. She will likely have further periods of sporadic unemployment after that and will likely need to limit her career choices due to long-term effects of the PTSD. The court further finds that, but for the accident, plaintiff would have worked to age 65 and had income of $956,000 (present value). Based on these conclusions, the court finds that Ms. Forcht will, more likely than not, suffer a lifetime loss to earning capacity of fifty percent (50%) resulting in loss of income of $478,000.

**Pain, suffering and disfigurement:**

Quantifying the pain and suffering experienced by a personal injury plaintiff is difficult in the best of circumstances. This difficulty is exacerbated in the instant case by two factors. First, the most significant pain and suffering in the present case is severe emotional suffering over the more than two year period since the time of the crash. Second, while there appears to be no dispute that the post traumatic stress syndrome plaintiff has suffered will remain with her for the rest of her life, there are significant questions as to the degree to which the plaintiff will be able to learn to cope with this trauma.

The court concludes that plaintiff will recover from her emotional injury in significant ways over time. Nonetheless, the emotional suffering will obviously continue to be a significant factor for the foreseeable future, and permanent emotional injuries will remain. While plaintiff will likely learn coping skills and the associated pain will diminish, a degree of suffering will likely persist with exacerbations or relapses from time to time throughout the remainder of plaintiff's life. Moreover, the emotional suffering plaintiff has endured has quite obviously been wholly debilitating at times and has severely affected plaintiff since the date of the crash.

This court is constrained to note that it approached plaintiff's claims of debilitating emotional injury in this and the related case of Richard DeMary with a significant degree of skepticism. Claims of long-term debilitating emotional injury are frequently asserted in a variety of tort actions, but seldom proved to this court's or a jury's satisfaction. This is not to say that some degree of distress is not proven with some frequency, but truly severe and debilitating distress is very rarely proven. Here, although the court was well aware of the great trauma that all survivors of the crash must have experienced, the court was far from predisposed to presume debilitating emotional injury. This was particularly true for these two plaintiffs because they were trained flight attendants, presumably better prepared to survive any crash without long term emotional distress.

However, after observing these plaintiffs, hearing their testimony as well as the testimony of numerous experts, including defendant's expert who specializes in the study and treatment of PTSD, the court cannot help but conclude that these two individuals have been severely and permanently injured. Moreover, the court is convinced, despite its initial skepticism that these plaintiffs' injuries have been exacerbated, rather than decreased or avoided, by their unique positions as flight attendants. This is because of their special feelings of responsibility to protect their passengers, and the associated guilt for failing to do so, even though there was, in reality, nothing further either of them could have done.

This is not to say that the court has found equal injury as between these two flight attendants. While both have been severely injured, those injuries are not the same, both because of the different characteristics of these individuals and because of differences in their crash experiences. Further, they have responded to the injuries in different ways, which will more likely result in differences in their long term recoveries.

That Ms. Forcht has been able to accomplish certain "normal" life functions does not diminish the pain obviously suffered. Certainly, the court has considered plaintiff's achievements in determining that plaintiff is not totally disabled from all of life's functions. The accomplishment of these normal activities does not lessen plaintiff's strong proof of significant ongoing emotional suffering. Based on the foregoing, the court awards $400,000 for pain and suffering. This

amount compensates for emotional and physical injuries as well as scarring and disfigurement.

Medical expenses
    Prior to trial—                                     None sought
    Anticipated future expenses                       $ 57,500.00
Loss of income before trial (stipulated amount)     $ 31,130.00
Probable loss of future income                     $478,000.00
Pain, suffering and disfigurement                   $400,000.00
TOTAL ACTUAL DAMAGES                   $966,630.00

**Total Damages:**

The court finds that plaintiff sustained damages as follows:

### CONCLUSIONS OF LAW

■ Because the United States has conceded liability, the applicable law in this case is the relevant law of damages. Under the Federal Tort Claims Act, the court sets damages under the law of the place where the complained of act or omission occurred. *Richards v. United States,* 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Neither party disputes that the substantive tort law of North Carolina applies to these cases.

■ Two damages limitations under the FTCA are applicable in this case. First, plaintiff may recover only compensatory damages as allowed by state law; punitive damages may not be recovered. See 28 U.S.C. § 2674. Second, no pre-judgment interest may be recovered in an FTCA action. Plaintiff has not sought either in this case.

■ Under North Carolina law, a plaintiff may recover the present worth of all damages that naturally flow from the defendant's conduct *King v. Britt,* 267 N.C. 594, 148 S.E.2d 594, 597 (1966). Specifically, under North Carolina law, a personal injury plaintiff may recover damages for pecuniary loss and expenses, loss or diminution of earnings during incapacity, impairment of future earning capacity, and pain and suffering, including mental suffering. *See United States v. Brooks,* 176 F.2d 482, 483–84 (4th Cir. 1949). This court's factual determination of the amounts of these damages are set forth above.

■ As the Fourth Circuit has recently repeated, compensatory damage awards should be "proportional to the actual injury incurred" and "must focus on the real injury sustained." *Hetzel v. County of Prince William,* 89 F.3d 169, 173 (4th Cir.1996) (revers-

ing $500,000 emotional distress award in a discrimination case as grossly excessive and suggesting $9000–$15,000 as a more appropriate award because plaintiff suffered no physical injury other than headaches, stress, difficulty reading, and family problems; continued to work with no noticeable reduction in performance; and never saw a doctor or therapist for the claimed emotional distress).

■ North Carolina courts recognize that the damages awarded should have the goal of restoring injured persons as nearly as possible to the position they would have been in but for the defendant's negligence. *See Jacobs v. Central Transport, Inc.,* 891 F.Supp. 1120 (E.D.N.C.1995). Plaintiffs must, however, act to mitigate their damages. *See Smith v. Childs,* 112 N.C.App. 672, 437 S.E.2d 500, 507 (1993) ("Plaintiff is barred from recovering for those losses which could have been prevented through the plaintiff's reasonable efforts."). In determining whether a plaintiff has failed to mitigate damages, the court can consider whether that person has failed to follow the advice of their physician or other treating professional. *E.g., Snead v. Holloman,* 101 N.C.App. 462, 400 S.E.2d 91, 93 (1991). In the present case, the court finds that plaintiff has taken all reasonable steps towards recovery.

■ In addition, in calculating damages under North Carolina law, the court should consider the effect of income taxes. *Livingston v. United States,* 817 F.Supp. 601, 605 (E.D.N.C.1993). Further all damages, including amounts awarded for non-economic damages, such as pain and suffering, must be reduced to present value. *King v. Britt,* 267 N.C. 594, 148 S.E.2d 594, 598 (1966). The

court has taken these factors into account in reaching its above stated award.

In considering the amount of the award in this case, this court has considered a variety of cases suggested by the United States as providing guidance of the amount of damages. For instance, in three cases offered, damages ranged from $12,500 to $100,000 for physical injuries that resulted in permanent impairments or scarring and a significant degree of pain and painful medical procedures. *Jones v. Hughes*, 110 N.C.App. 262, 429 S.E.2d 399, *cert. denied*, 335 N.C. 175, 436 S.E.2d 378 (1993) ($100,000 awarded in addition to medical expenses for permanent dental injuries that required numerous, painful dental procedures and for injury to leg, both requiring hospitalization for twenty-four days and that left permanent scarring and disfigurement); *Ferrell v. Frye*, 108 N.C.App. 521, 424 S.E.2d 197 (1993) ($12,500 awarded for permanent injuries suffered in performance of duties, which included injuries to neck and shoulder leading to persistent pain and daily headaches); *Kremer v. Food Lion, Inc.*, 102 N.C.App. 291, 401 S.E.2d 837 (1991) ($90,000 awarded for injuries resulting from fall, which included a hip fracture resulting in 20% partial permanent disability to right leg). While at least two of these cases present physical injuries with resulting physical pain and suffering that might even exceed that associated with the physical injuries of the present plaintiff, they are of little guidance as to the very significant emotional injuries in the present case.

Defendant also directs the court to *Musick v. United States*, 781 F.Supp. 445 (W.D.Va. 1991), a Federal Tort Claims Act case involving a head injury and multiple contusions which caused among other things, Post Traumatic Stress Disorder. The fifty-seven year old plaintiff in *Musick* suffered permanent hearing loss, numbness in lower extremities and a personality change characterized by marital paranoia and severe personal neglect. The court in that case awarded medical expenses plus $120,000 for bodily injuries and $100,000 for pain and suffering. Although this award includes recovery for PTSD the level of PTSD injury and the percentage of the award attributable to PTSD injuries appear to this court to be far less significant than in the present case. *See also Hardison v. Ferebee*, CVS 1160 (N.C.Super.Ct.1993) (awarding $125,000 to woman suffering PTSD, an eating disorder, fecal incontinence, and paranoia as a result of being stalked and harassed for years by a male).

The court is not, however, persuaded that the damages awarded in the cases cited by defendant are particularly instructive here. This is primarily because damages for emotional distress are perhaps the most difficult damages to quantify. They are unique to each plaintiff, requiring careful inquiry into the event experienced, the plaintiff's reaction to those events, and the plaintiff's prospects for recovery. They, therefore, vary widely and can only be determined after a careful but necessarily subjective analysis by the finder of fact.[13] Here, the indescriba-

---

13. In contrast to the verdicts cited by defendant, this court has located numerous verdicts with significantly higher awards in cases in which emotional distress injuries made up a significant portion of the damages. *See Havinga v. Crowley Towing and Transp. Co.*, 24 F.3d 1480 (1st Cir. 1994) (affirming awards of $200,000 to $450,000 each for emotional pain and suffering of five sailors who were stranded in rubber life boat in shark infested waters for four and one half hours after their ship sank as a result of a collision); *Schneider v. National Railroad Passenger Corporation*, 987 F.2d 132 (2d Cir.1993) (finding that jury verdict of $1.75 million awarded to railroad employee in FELA case was not excessive recovery for physical and emotional distress (PTSD) injuries that resulted from a brutal attack that occurred when the employee was leaving work); *Kukla v. Syfus Leasing Corp.*, 928 F.Supp. 1328 (S.D.N.Y.1996) (refusing to set aside jury award of $750,000 for past pain and suffering plus $600,000 for future pain and suffering awarded to rape victim, largely for emotional distress damages (PTSD)); *see also Sosa v. Jefferson County*, No. C–95–229 (W.D.Ky. March 1, 1996) (jury award of $1.18 million in damages including $150,000 punitive damages in Section 1983 case against Department of Corrections officials for mistreatment of arrestee because he had AIDS and was of Latin American descent—the damage award apparently related solely to emotional distress injuries with limited direct economic losses resulting from those injuries as plaintiff was unemployed at the time of his arrest); *Lucas v. J.C. Penney Co.*, No. C93–1840C (W.D.Wash. Jan. 17, 1996) (jury award of $1.5 million in hostile environment employment discrimination case where 56 year old plaintiff was

ble horror of the event that plaintiff constantly relives, the associated survivor guilt, and the continuing severe impact on plaintiff's daily life dictate an award dissimilar to that in the cases cited by defendant.

The court has also considered defendant's argument that the plaintiff received training to deal with the type of event that occurred. That is, plaintiff was trained to assist passengers in the event of a crash. This training included certain simulations including being in a smoke filled cabin.

While this training might well prepare flight attendants for the possibility of a crash, and thereby increase their ability to help passengers, it would be unlikely to prepare a flight attendant for the horrors witnessed here. This was a catastrophic crash that literally ripped the plane into two pieces, scattering bodies and body parts and destroying the majority of the passenger section. The crash was accompanied by explosions that severely burned passengers and this flight attendant, leaving charred and dismembered bodies to which this attendant was exposed. These bodies included those of small children and passengers recently seated by this attendant.

It is obvious that this flight attendant experienced (and continues to experience) extreme feelings of guilt because she was responsible, to the extent possible, for the safe exit of passengers in the event of the crash. The court is quite convinced that these feelings of guilt are genuine and deep despite the fact that this flight attendant could have done nothing further to assist the passengers under these catastrophic circumstances.

■ Therefore, the court may agree that flight attendants understand that due to their frequency of travel they are at a greater risk of being in a crash. The court may also agree that the attendant understands and assumes special duties for the safety of others in the event of a crash. The attendants' state of knowledge might well better prepare them to survive at least some crashes without as severe an emotional impact as the average passenger. Even accepting these propositions, however, the court cannot see how this provides any defense or reason to reduce damages for injuries which have, in fact, occurred.

■ Certainly, plaintiff cannot be said to have assumed the risk of this catastrophic crash, which would bar recovery altogether. The court is aware of no other doctrine or legal authority for reducing recovery simply because a person was aware of a possible risk of their occupation.

forced into early retirement by management's inappropriate response to coworker's continuing use of racial slurs and threats of violence—although the award is apparently largely attributable to emotional distress injuries, it includes some unsegregated economic losses); *Bishop v. CMI Corp.*, No. CIV–94–2054–L (W.D.Okla. Nov. 20, 1995)(awarding $1 million in damages, including $250,000 for mental distress damages in wrongful termination case when plaintiff had worked for the employer only a short time; was fired because of a disability characterized by involuntary tics, jerks, and other body motions; and was rehired after filing a discrimination complaint); *Hall v. Power*, No. 91–1519 CA 03 (Fla. Cir. Ct. Nov 13, 1995) (awarding $2.08 million in damages for wrongful denial of insurance coverage to woman who later died after being denied treatment at various facilities for her cancer—the award included $500,000 in emotional distress damages each to the cancer victim's estate and her husband); *Giraldo v. United States*, CV No. 91–0133 (E.D.N.Y. July 7, 1995) (awarding total damages of $2.12 million against the government in an FTCA case, including $1.2 million for past pain and suffering,

$200,000 for for future pain and suffering, $298,000 for future medical care, and $417,000 for loss of future earnings capacity in airline crash case causing severe physical injuries and PTSD with depression which, coupled with physical injuries to plaintiff's hands, would limit plaintiff's future employability, particularly in his chosen field as an aspiring professional musician). This court has not relied on these awards to determine its present award, indeed, this court has not determined the later history of the various unreported cases. Rather, these cases are referred to here simply to demonstrate the broad range of damages that have been awarded for emotional distress injuries. This court is also intimately familiar with the details of settlements in many other personal injury actions arising out of the crash of USAir Flight 1016, having presided over numerous settlement approval hearings, and having successfully mediated some of the other cases. Although it plays no part in the court's decision-making process in the present case, the court observes that the award in this case is not out of line with amounts received by other injured passengers relative to the severity of the injuries suffered.

## CONCLUSION

Based on the forgoing analysis, the court finds that the plaintiff is entitled to a verdict against the defendant for the above stated actual damages sustained by the plaintiff as a result of the crash of USAir Flight 1016 on July 2, 1994. The Clerk of Court is hereby directed to enter judgment in favor of the plaintiff against the defendant in the amount of $966,630.00

IT IS SO ORDERED

## AMENDED JUDGMENT

**Decision by the Court.** This action came to trial without a jury before the Court, Honorable Joseph F. Anderson, Jr., District Judge, presiding. On May 1, 1997, the Court having heard plaintiff's motion to reconsider the amount of damages; and, the Court having granted on June 13, 1997 the motion as it relates to physical and emotional suffering,

IS ORDERED AND ADJUDGED that the plaintiff, Karen Forcht, recover of the defendant, the United States of America, actual damages in the sum of One Million One Hundred Sixteen Thousand Six Hundred Thirty and no/100 ($1,116,630.00) Dollars. Post judgment interest shall accrue at the original rate of 6.00 percent.

## ORDER ON MOTION TO RECONSIDER AMOUNT OF DAMAGES I

Presently before the court is plaintiff's motion to reconsider the amount of damages awarded in this matter. Oral argument was heard on this motion on May 1, 1997.

Plaintiff takes issue with two primary components of the court's earlier findings and conclusions. First, plaintiff argues that in awarding damages for economic losses, the court failed to consider certain evidence, most particularly evidence of admitted damages. Second, plaintiff argues that the compensation awarded for the emotional pain and suffering associated with her emotional injuries is inadequate in light of the court's factual findings.

The court rejects plaintiff's economic loss argument. Although the court may not have expressly addressed the evidence and concerns now raised by plaintiff in the original order, the court took all of the evidence into account in concluding that plaintiff had suffered total lifetime earning losses of a given percentage.

Plaintiff seems, in part, to rely on an argument which equates the court's finding that plaintiff has suffered a given percentage loss of lifetime earnings with a finding that plaintiff suffers a given percentage disability for life. The two are not necessarily related. Here, the court concluded that plaintiff's injuries will have differing impacts, on both employability and general life abilities, at different times in her life. The court's conclusion that plaintiff will suffer a certain percentage in loss of income over a lifetime is the result of an amalgamation of findings that plaintiff will or has suffered certain times of full disability and certain times of partial disability, and that she will, more likely than not, continue to suffer residual effects on income even if employed. The court will, however, modify one element of the damages calculation, that being the damages awarded for emotional suffering. As the court noted in its original order, these damages were the most difficult to establish. The court had no doubt that plaintiff suffers and will continue to suffer very real emotional pain. The degree and duration of suffering in the future were, however, difficult to predict. The measure of damages to place on such suffering was, therefore, particularly difficult.

After careful reexamination, this court has determined that the original award for this element of damages (which included physical and emotional suffering as well as disfigurement) of $400,000 was inadequate and that it should be increased by $150,000 to $550,000. This will result in a total damages award of $1,116,630 rather than the $966,630.00 originally awarded.

One further matter requires comment. As counsel are aware, this court is familiar with the amount of many settlements resulting from this air disaster. At best, this information deserves only peripheral consideration as a check to insure the amounts awarded by the court were not wholly excessive or inadequate in light of the informed decisions of

experienced counsel as to the value of various air disaster cases. This court has not, however, allowed the amounts of any settlements to influence the present decision. There are simply too many factors influencing the value placed on any given case to rely on one for the value of another. Of these factors, one of the most significant is the tremendous variation in the form and degree of emotional suffering an individual may experience as a result of a tragedy of this magnitude.

IT IS SO ORDERED